# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>COMERICA BANK,<br><br>　　　　　Defendant. | **COMPLAINT** |

## INTRODUCTION

1.　　　The Consumer Financial Protection Bureau (Bureau) brings this action against Comerica Bank (Comerica or the Bank) under Sections 1031, 1036, 1054, and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a)(1)(A)-(B), 5564, and 5565; the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693 *et seq.*; and its implementing Regulation E, 12 C.F.R. pt. 1005, Subpart A.

2.　　　While recipients of Social Security and other federal benefits often receive funds to the account of their choice, millions of senior citizens, disabled Americans, and other beneficiaries receive them through the Direct Express Debit Mastercard (Direct Express) program. Since 2008, Comerica has contracted with the U.S. Department of the Treasury's Bureau of the Fiscal Service (BFS) to serve as the exclusive administrator for the Direct Express program, which makes federal benefit payments available to consumers via prepaid debit card accounts. Direct Express cardholders—including but not limited to older Americans receiving Social Security benefits, disabled Americans receiving Social Security disability insurance payments, and coal workers eligible for federal benefits related to black lung disease—have their

1

benefit loaded onto the prepaid cards issued by Comerica, which they can use to pay for groceries, gas, and other expenses.

3.        Since April 1, 2019, however, Comerica has impaired cardholders' ability to protect and access their funds by routinely providing deficient customer service to Direct Express cardholders. For example, the Bank's vendors have intentionally terminated almost 25 million customer-service calls from cardholders who were on hold before the cardholders could speak to a representative, and cardholders whose calls were not terminated have been frequently subjected to excessive wait times to speak with a representative, sometimes up to several hours. Among other harms inflicted, Comerica's inadequate customer service has impeded Direct Express cardholders' efforts to dispute unauthorized transfers and bookkeeping errors and to seek liability protection from unauthorized transfers as provided in Regulation E.

4.        Comerica has also failed to provide consumers who contacted the Bank alleging they had been fraudulently enrolled into the Direct Express program with accurate and complete information regarding the claimed fraud. For example, Comerica, through its Vendors, frequently advised consumers that "no error occurred" even though the Bank had determined that there was, in fact, enrollment fraud.

5.        Comerica, through its Vendors, also charged more than one million Direct Express cardholders ATM fees to access their government benefits in situations where the cardholders were entitled to free withdrawals.

6.        Comerica also has repeatedly failed to comply with the EFTA and Regulation E in its treatment of Direct Express cardholders. For example, Comerica failed to honor timely requests to cancel preauthorized transfers (like an automatically recurring utility bill or

mortgage payment), failed to timely investigate cardholders' notices of error, and failed to report the results of its investigations back to cardholders. In one particularly egregious example involving thousands of consumers, Comerica refused to honor timely stop-payment requests and instead required cardholders to request a new debit card, thereby precluding cardholders from accessing their own funds for a period of time and, when cardholders sought to minimize their time without a card, charging them fees to expedite delivery.

7.      As explained below, Comerica's conduct in administering the Direct Express program violates the CFPA's prohibition on unfair acts or practices, the EFTA's prohibition on waiving consumers' rights conferred by the statute, and numerous requirements of Regulation E.

8.      The Bureau seeks injunctive and other equitable relief to address and remedy Comerica's unlawful conduct, redress and damages for injured consumers, and a civil money penalty.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

10.     Venue is proper in this district because Comerica is located, resides, and does business in this district. 12 U.S.C. § 5564(f); 28 U.S.C. § 1391(b)(1).

## PARTIES

11.     The Bureau is an independent agency of the United States charged with regulating "the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491(a). The Bureau has independent litigating

authority, 12 U.S.C. § 5564(a)-(b), including the authority to enforce the CFPA, the EFTA, and Regulation E, and to secure appropriate relief for violations of those provisions, 12 U.S.C. §§ 5481(12)(C) and (14), 5565.

12.    Comerica is a Texas banking association headquartered in Dallas, Texas. Comerica is a subsidiary of Comerica Incorporated, one of the largest banking associations in the country.

13.    Comerica is a "covered person" pursuant to 12 U.S.C. § 5481(6)(A) because it offers and provides consumer financial products or services, as defined under 12 U.S.C. § 5481(5). Relevant to this action, Comerica engages in deposit-taking activities, transmits or exchanges funds, and otherwise acts as a custodian of funds or any financial instrument for use by or on behalf of consumers primarily for personal, family, or household purposes. 12 U.S.C. § 5481(15)(A)(iv).

14.    Comerica is also a "financial institution" subject to the EFTA and Regulation E because it is a national bank holding consumer deposit accounts. 15 U.S.C. § 1693a(9); 12 C.F.R. § 1005.2(i).

## FACTUAL ALLEGATIONS

### A. Direct Express Program

15.    In 2007, BFS established the Direct Express program. Through this program, recipients of certain benefits—federal and state-disbursed Social Security and supplemental security income (SSI) for adults and children with disabilities, veterans' pension and education assistance, civil service retirement, and compensation for coal workers with black lung disease, among others—can receive their benefits on a prepaid debit card.

16.    Since 2013, with limited exceptions, non-veteran federal beneficiaries have had

only two options for how to receive their benefit payments: through a Direct Express card or direct deposit to a bank account.

17.      Since January 2008, Comerica has had an exclusive contract with BFS to administer the Direct Express program by providing the prepaid Direct Express card and associated account services to enrollees in the program. In exchange, BFS pays Comerica a fee for every beneficiary who enrolls in the Direct Express program.

18.      Comerica provides around $3 billion in benefits annually to approximately 4.5 million Direct Express cardholders.

**B.  Comerica's Use of Vendors for Account Services**

19.      Comerica's contract with BFS allows the Bank to use contractors to perform services under the agreement but stipulates that Comerica is responsible for the acts or omissions of the contractors as if the acts or omissions were its own. Under the terms of its contract with BFS, Comerica is responsible for the supervision and management of its Vendors and is required to remove and replace any Vendor that fails to perform satisfactorily.

20.      Comerica has outsourced the performance of many account services subject to the EFTA and Regulation E to two vendors: Vendor 1 and Vendor 2 (collectively, "the Vendors"). These services include providing cardholders disclosures and account statements; issuing and funding cards; stopping preauthorized transfers at the cardholder's request; call monitoring and complaint management; and resolving notices of error by providing provisional credit, performing investigations, communicating these investigations' results to cardholders, and correcting errors.

21.      Vendor 2 performs account services for a few hundred thousand cardholders accounts, while Vendor 1 performs account services for the remaining millions of accounts.

22.     The Vendors also each manage a version of Comerica's customer service phone line, providing infrastructure for the phone line and recruiting, training, and paying the customer service representatives who field cardholder inquiries and complaints.

23.     Comerica compensates the Vendors by paying them fees for managing certain aspects of the Direct Express program. In particular, it pays the Vendors a fee for every call their customer service representatives answer.

24.     Though Comerica has outsourced a number of the Direct Express program's cardholder services to the Vendors, it cannot outsource its obligations to administer the program in compliance with Regulation E, the EFTA, and the CFPA. Comerica must ensure that its Vendors comply with these laws or be liable for their failures.

**C.  Comerica's Overloaded and Understaffed Customer Service Phone Lines**

25.     Direct Express cardholders rely on Comerica's customer service phone lines for their account services.

26.     Since at least April 1, 2019, Comerica has advertised its customer service phone lines as the best way to contact the Bank. In the Direct Express welcome letter and Terms of Use Comerica sends to new cardholders, the Bank touts that the phone line is available "24 Hours a Day / 7 Days a Week" to address any questions or concerns the cardholder may have.

27.     By Comerica's design, the customer service phone lines are cardholders' most convenient option to access account services. The Bank will only accept Regulation E notices of error or requests to stop preauthorized payments through the phone line or the mail. Although Comerica does currently offer certain automated options on its phone line, as well as a Direct Express website and app, cardholders cannot use these methods to access Regulation E's protections. They can only use the website and app for basic services like checking their account

6

balances, ordering replacement cards, and changing their contact information. Before 2022, the website and app only allowed cardholders to view their account information. To avail themselves of Regulation E protections by, for instance, filing a notice of error, initiating a stop payment request, or cancelling a preauthorized transfer, cardholders had to call or write the Bank.

28.     Moreover, Comerica knows that Direct Express cardholders generally prefer to speak with customer service representatives even when seeking the basic information they can also obtain from the phone line's automated options, the Direct Express website, or the app.

29.     The volume of calls to Comerica's customer service phone lines (which are managed by its Vendors), consistently spikes during one period each month: the nine days surrounding the release of federal benefit payments, which starts one day preceding SSI payments and ends seven days following it and is known as the "disbursement period." Each month, roughly 60% to 70% of calls to the customer service phone lines are made during the disbursement period.

30.     When calling into Comerica's customer service phone lines Direct Express cardholders regularly endure long waits—sometimes waiting for as much as two-and-a-half hours—to speak with a customer service representative. These long waits can occur any time during the month, during both disbursement and non-disbursement periods.

31.     Comerica's contracts with BFS and the Vendors include a set of Service Level Requirements (SLRs), which establish "expected performance levels" for, among other things, how long cardholders should wait, on average, to reach a representative ("average call wait time") and how frequently cardholders should hang up while waiting to reach a customer service representative ("call abandonment rate").

32.     Within the call center industry, the call abandonment rate is designed to assess how many callers hang up out of frustration from waiting on hold.

33.     Under the SLRs, cardholders are expected to wait no more than 10 minutes to speak with a customer service representative and abandon calls no more than 15% of the time during the disbursement period. At all other times each month, cardholders are expected to wait no more than 8 minutes and abandon calls no more than 12% of the time.

34.     In reality, Direct Express cardholders have often had to wait far longer, and have abandoned their calls far more frequently, than the SLRs contemplate.

35.     For example, during both disbursement and non-disbursement periods in March, April, and May 2022, cardholders calling into the Vendor 1- and Vendor 2-managed phone lines waited over an hour, on average, to speak with a customer service representative. During these same months, some cardholders waited for as long as two-and-a-half hours to speak with a customer service representative.

36.     Moreover, from April 1, 2019 to May 31, 2023, the Vendors have each repeatedly failed to meet the SLRs for average call wait times and abandonment rates. Average call wait times on the Vendor 1-managed phone line have been longer than expected 40% of the time and calls abandoned more frequently than expected 32% of the time. Average call wait times on the Vendor 2-managed phone line have been longer than expected 43% of the time and calls abandoned more frequently than expected 10% of the time.

37.     Direct Express cardholders have frequently complained about their lengthy waits. In June 2019 alone, Comerica received 274 complaints from cardholders unable to reach Vendor 1—some of whom reported waiting four hours to reach a representative. In July 2019, the Bank

received 358 similar complaints. As recently as at least September 2023, cardholders continued to endure hours-long waits on the customer service phone lines.

38.    The main cause of these long waits on Comerica's customer service phone lines is that Comerica, through its Vendors, does not have enough customer service representatives to meet cardholder demand.

39.    Another problem with Comerica's customer service phone lines is that some Direct Express cardholders who call Vendor 1's customer service phone line never reach a representative because Vendor 1 repeatedly and involuntarily disconnects their calls. Vendor 1, unlike Vendor 2, does not offer to call cardholders back when call volumes are high. To reduce wait times during high call volume periods, Vendor 1 instead automatically and intentionally drops any call that it determines does not concern a limited set of topics, using a function called Heavy Queue. Heavy Queue is activated based on the raw number of calls already in queue or when call volume is elevated relative to the number of available customer service representatives.

40.    The specific number of calls that triggers Heavy Queue has varied since April 1, 2019. Vendor 1 currently activates Heavy Queue if (1) the number of calls in queue is greater than 4 times the number of available customer service representatives, or (2) the number of calls in queue exceeds 600 calls with a wait time of over 30 minutes. Heavy Queue remains active until call queue volumes return to a "reasonable" level, which neither Vendor 1's nor Comerica's policies define.

41.    Before September 2019, Heavy Queue, when active, dropped *all calls*. Since that time, Heavy Queue drops calls based on the issues Vendor 1 determines cardholders are calling about.

42.     When Direct Express cardholders call Vendor 1's phone line, they first encounter an automated phone tree that asks them to identify, from a provided set of topics, the nature of their call.

43.     Currently, when Heavy Queue is active, cardholders will be placed in a queue to wait for the next available customer service representative if they select the topics for reporting an expired, lost, or stolen card; inquiring about a card blocked due to suspected fraud; or calling about new, existing, and closed disputes.

44.     Cardholders who do not select one of the foregoing options will hear a recorded message that indicates the Bank is "experiencing heavy call volumes," directs them to use the website or try calling back later, and then disconnects the call. The recorded message does not provide information about when a customer service representative will become available, nor does it prompt the caller to request a call back from a representative.

45.     Comerica knows that Vendor 1 has used Heavy Queue since 2013 and, to date, has continually allowed it to do so.

46.     From April 1, 2019 to June 30, 2023, Vendor 1 dropped almost 25 million calls with its Heavy Queue function—3.5 million more calls than it answered.

47.     Even though Vendor 1 uses Heavy Queue to manage high call volumes, call wait times for cardholders who do not have their calls disconnected are frequently long.

48.     Cardholders whose calls Heavy Queue drops must continue to call the customer service phone line until Heavy Queue is deactivated. Some of these cardholders have had to call repeatedly, over hours and even days, to reach a customer service representative.

49.    At times, Direct Express cardholders have had such difficulty reaching a customer service representative through Vendor 1's phone line that they have found ways to contact Vendor 2 and Comerica.

50.    When Direct Express cardholders with Vendor 1-managed cards call Vendor 2 because they cannot get through via Vendor 1's phone line, Vendor 2 can only direct them to try calling Vendor 1 again.

51.    Direct Express cardholders with Vendor 1-managed cards also sometimes call Comerica directly because they cannot get through via Vendor 1's phone line. When this happens, Comerica assesses whether they are calling to report a Regulation E error; if so, it will connect them directly to Vendor 1. Comerica regularly receives calls from cardholders who cannot get through to Vendor 1 to report a Regulation E error.

52.    In or around February 2021, Comerica created a separate, dedicated phone line to backchannel these cardholders directly to Vendor 1 because it was concerned that the inaccessibility of Vendor 1's phone line would result in a failure to resolve these cardholders' errors within Regulation E's mandated timelines.

53.    Since creating the separate phone line, Comerica has received calls every month from cardholders who need to report Regulation E errors but cannot reach a customer service representative via Vendor 1's phone line. The overwhelming majority of these cardholders called to report unauthorized transfers on their accounts.

54.    Direct Express cardholders had to wait long periods of time, or have had their calls repeatedly dropped, when trying to alert Comerica to unauthorized transfers on their accounts, receive provisional and final credit for such transfers, report lost cards and other

account problems that prevent them from using their funds, or otherwise obtain account assistance.

55.     Comerica's failure to ensure that its Vendors provide timely and effective assistance to Direct Express cardholders interferes with cardholders' ability to protect and access their funds. For example, these failures delay or prevent cardholders from receiving protection from and compensation for unauthorized transfers, and from otherwise receiving access to their government benefits.

56.     Being forced to endure long wait times, or having one's call repeatedly dropped with no information on when anyone will be available to take it, also wastes cardholders' time. Some cardholders waited anywhere from 30 minutes to 7 hours to speak with a customer service representative and had to call repeatedly, sometimes over months, to get help with unauthorized transfers and replacement cards.

57.     Many Direct Express cardholders are beneficiaries of federal programs for retirees and individuals unable to work due to disability and thus have little income. Indeed, government benefits are some cardholders' sole source of income. Losing access to these benefits, even temporarily, can leave cardholders unable to pay for housing, utilities, food, and other necessities. The same is true when cardholders' funds are stolen through unauthorized transfers.

58.     For example, one cardholder attempted to contact Comerica because she had ordered a replacement card but never received it. The cardholder, who has a hearing and speech impediment, had a personal representative assist her. They each called Comerica for assistance at least three times a week for three months, at times waiting almost an hour to speak with a customer service representative. The cardholder eventually had to open a bank account to get access to her funds because she had not received her replacement card; in the meantime, she

could not pay her rent or utilities, had her electricity turned off and incurred a turn-on fee, and had to take out an $800 loan from her personal representative.

59.    Another cardholder received a letter from Direct Express informing her that a different Vendor would be managing her account and that she would be receiving a new card in the mail the following month. After not receiving a new card she called Vendor 1's phone line every day for a month, and then every other day for the next two months, because Heavy Queue repeatedly dropped her calls. She had no access to her benefits for three months and had to send a letter to her landlord explaining why she was late on rent.

60.    These barriers to protecting and accessing their funds likely have led some cardholders to give up entirely on seeking Regulation E's protections or other assistance.

61.    Direct Express cardholders cannot opt to have another bank administer their Direct Express account. Nor can they choose which vendor Comerica designates to provide them with account services.

### D. Comerica's Failure to Provide Cardholders with Accurate and Complete Information Regarding Enrollment Fraud

62.    Sometimes consumers contact Comerica alleging they have been fraudulently enrolled into the Direct Express program because someone has improperly created an account in their name. When this occurs, Vendor 1, following procedures approved by Comerica, investigates their claims in the same way it investigates notices of error under Regulation E.

63.    If Vendor 1 determines that enrollment fraud occurred, it sends a template *denial* letter from the Direct Express Fraud Services Department to the consumer, which states incorrectly that the Bank has determined "that the transaction(s) in question were not unauthorized; therefore, no error occurred."

64.    This letter does not accurately inform consumers of the results of Vendor 1's investigation: that enrollment fraud in fact occurred. Nor does it inform consumers that they need to contact the government entity paying the benefits at issue to recover any benefits that may have been stolen.

65.    Under Vendor 1's procedures, only cardholders who call Vendor 1's customer service phone line in response to receiving the denial letter are informed about the occurrence of enrollment fraud and receive information about how to remedy the problem.

66.    Those consumers who do not call Vendor 1's customer service phone line about fraudulent enrollment claims—perhaps because they understand the letter coming from the Direct Express Fraud Services Department to be a final resolution with all relevant information about their claims included—are never informed that Comerica or its Vendor determined there was enrollment fraud or how the consumer can recover the lost benefits.

**E.  Comerica's Practice of Charging Cardholders ATM Fees They Did Not Owe**

67.    Between April 1, 2019 and April 30, 2024, Comerica, through its Vendors, charged cardholders ATM fees that they did not owe.

68.    At the time of enrollment, Comerica, through its Vendors, provided cardholders with a disclosure itemizing all fees authorized for the Direct Express program.

69.    The disclosure provided that cardholders are entitled to one free ATM withdrawal per month per deposit of funds into their Direct Express accounts and that Comerica, through its Vendors, assesses a fee for each additional withdrawal. The disclosure also confirmed that "There is no ATM denial fee associated with this account."

14

70.     Comerica, through its Vendors, tracked cardholders' free monthly ATM withdrawal benefit by applying an ATM withdrawal waiver to each Direct Express account every month.

71.     Comerica's Vendors received a benefits payment file for each cardholder before the date the benefits were available to the cardholder for use and withdrawal. When Comerica Vendors received this payment file, they often reset the cardholder's monthly ATM withdrawal waiver.

72.     Because of this sequencing, a gap in time, generally lasting one to five days, existed between the reset of the ATM withdrawal waiver and the cardholder's ability to access their funds for withdrawal ("the interstitial period").

73.     Comerica, through its Vendors, did not notify cardholders of the interstitial period or that failed ATM withdrawals attempted during the interstitial period could use up the cardholder's free ATM withdrawal for the month.

74.     Where a cardholder attempted an ATM withdrawal in the interstitial period and the account had insufficient funds to complete the withdrawal, Comerica, through its Vendors, denied the transaction. Despite denying the transaction for insufficient funds and not disbursing any money, Comerica, through its Vendors, applied the ATM withdrawal waiver to the ATM denial, which should never have incurred any fees.

75.     When a cardholder in this situation later successfully completed the first transaction after the newly deposited funds became available for withdrawal, Comerica, through its Vendors, charged the cardholder an ATM withdrawal fee for the transaction—improperly denying the cardholder the free monthly ATM withdrawal to which they were entitled.

76.    During the relevant period, Comerica, through its Vendors, charged more than 1 million Direct Express cardholders ATM fees for withdrawals that should have been free.

**F. Comerica's Failure to Stop Payments**

77.    When consumers sign up for Direct Express accounts, they receive terms of use (Terms) which govern usage of their Direct Express cards.

78.    Section B.2. of the Terms addresses preauthorized payments and states that Direct Express cardholders have the right to cancel a preauthorized payment (commonly referred to as a "stop-payment request").

79.    The Terms sent to new Direct Express cardholders between April 1, 2019 and May 31, 2020, listed two requirements to cancel a preauthorized payment: (1) Direct Express cardholders had to contact customer service at the provided phone number or address at least three business days before the scheduled date of payment, and (2) they also had to notify the merchant.

80.    In May 2020, Comerica, through its Vendors, began sending a change notice to Direct Express cardholders, deleting from the Terms the requirement to notify the merchant from the section on preauthorized payments.

81.    For Direct Express cardholders whose accounts were serviced by Vendor 1, from April 1, 2019 to July 2, 2020, customer service representatives refused to process stop-payment requests unless the cardholder making the request indicated they had already contacted the merchant.

82.    For Direct Express cardholders whose accounts were serviced by Vendor 2, prior to August 31, 2020, Vendor 2 would not process stop-payment requests even if the consumer had contacted the merchant because Vendor 2 lacked the capability to stop

preauthorized payments.

83.    Instead, when Direct Express cardholders submitted stop-payment requests to Vendor 2, Vendor 2's customer service representatives advised them they could either contact the merchant and hope the merchant would stop processing the payment or close their accounts and request a new debit card. The new account would not have the preauthorization for the transfer that was attached to the old account number.

84.    Cardholders who followed Vendor 2's instructions to close an account and request a new card were charged a $4.00 fee for the replacement card. If the consumer requested expedited delivery, the consumer was charged an additional $13.50.

85.    Because Comerica, through its Vendors, offered cardholders one free replacement card per year, if the consumer had not yet received a replacement card in the past year, the $4.00 fee would be waived but the expedited delivery fee still applied.

86.    Since April 1, 2019, Comerica, through its Vendors, has failed to honor thousands of Direct Express cardholders' timely stop-payment requests on preauthorized transfers.

**G. Comerica's Failure to Timely Investigate Cardholder Claims**

87.    In its Terms, Comerica, through its Vendors, directs Direct Express cardholders to contact customer support as soon as they can in instances where they believe an error has occurred with their account.

88.     Under Regulation E, financial institutions must promptly investigate and resolve notices of error and limit consumer liability for unauthorized electronic funds transfers (EFTs). 12 C.F.R. § 1005.11(c).

89.    Financial institutions are required to complete their investigations within 10

business days of receiving a notice of error. This can be extended to 45 days if the financial institution gives the consumer provisional credit, and it can be extended further to 90 days if the disputed transaction involves an EFT that was not initiated within a state, resulted from a point-of-sale debit card transaction, or happened within 30 days after the first account deposit was made. *Id*.

90.     Since April 1, 2019, in more than 19,900 instances, Comerica, through its Vendors, has failed to promptly investigate Direct Express cardholders' notices of error concerning alleged unauthorized EFTs because it failed to determine whether an error occurred within 10 business days of receiving the notice of error and could not avail itself of the longer time periods for investigation permitted under Regulation E because it did not provide provisional credit to consumers in these instances.

91.     During the same period, in more than 1,500 instances where Comerica, through its Vendors, did issue provisional credits to consumers, it still failed to complete its investigation of Direct Express cardholders' notices of error concerning alleged unauthorized EFTs within the required timeframes under Regulation E.

**H. Comerica's Failure to Report the Results of Its Investigations**

92.     Under Regulation E, a financial institution must "report the results" of an investigation of a notice of error to the consumer within three business days after completing its investigation. 12 C.F.R § 1005.11(c)(1) and (c)(2)(iv).

93.     Since April 1, 2019, Comerica, through its Vendors, has failed to send responses to consumers reporting the results of investigations of notices of error in at least 140 instances.

94.     Additionally, one of the templates Comerica's Vendors used to deny claims of error informed Direct Express cardholders that it had completed the investigation but failed to

state whether the claim was approved or denied.

95.    Instead, the letter informed the Direct Express cardholders that it "found a conflict in the information provided by [the consumer] and the information resulting from our research" and that it "cannot confirm that fraud occurred" but did not state whether the claim was approved or denied.

96.    Since April 1, 2019, Comerica, through its Vendors, sent this letter in response to more than 220,000 different claims from Direct Express cardholders.

### I.    Comerica's Failure to Provide Cardholders with a Written Explanation of Its Findings

97.    Under Regulation E, if a financial institution "determines that no error occurred or that an error occurred in a manner or amount different from that described by the consumer," the report of the results of the investigation "shall include a written explanation of the institution's findings and shall note the consumer's right to request the documents that the institution relied on in making its determination." 12 C.F.R. § 1005.11(d)(1).

98.    Since April 1, 2019, Comerica, through its Vendors, has failed to send written explanations to Direct Express cardholders informing them that no error occurred or that an error occurred in a manner or amount that was different from what the cardholders indicated in more than 40 instances.

99.    In another more than 220,000 instances, Comerica, through its Vendors, upon completing investigations of notices of error, sent notices to consumers that were vague and failed to provide an explanation of its findings related to the claim.

### J.    Comerica's Failure to Notify Cardholders that Provisional Credit Was Made Final

100.    Under Regulation E, when a financial institution reports the results of its investigation to consumers it must provide certain other information. 12 C.F.R.

§ 1005.11(c)(2)(iv). If the financial institution approves a consumer's claim and the institution had previously issued the consumer a provisional credit, the report must inform the consumer that the provisional credit was made final.

101.    Since at least November 15, 2020, Comerica, through its Vendors, failed to send out any notices to more than 140 Direct Express cardholders informing them that it had made final previously issued provisional credit.

102.    During the same time period, Comerica, through its Vendors, did send notices to more than 1,350 Direct Express cardholders informing them that their claims had been approved but those notices failed to state that the Bank made the previously issued provisional credit final.

**K. Comerica's Failure to Provide Notification of Date and Amount of Debiting of Previously Issued Provisional Credit**

103.    Regulation E requires that a financial institution, upon debiting a provisionally credited amount, notify the consumer of the date and amount of the debiting. 12 C.F.R. § 1005.11(d)(2)(i).

104.    From November 15, 2020 to January 10, 2021, Comerica, through its Vendors, failed to notify Direct Express cardholders that previously issued provisional credit had been reversed in more than 360 instances.

105.    Additionally, since May 24, 2021, where Comerica, through its Vendors, did notify Direct Express cardholders that provisional credit would be reversed, Comerica failed to include the required notice of the specific date on which this would occur in more than 6,900 instances. Instead, the letters stated that the provisional credit that was issued on a specific date "has been reversed" but failed to state the actual date of the reversal.

**L. Comerica's Failure to Notify Cardholders that It Would Honor Checks and Drafts for Five Business Days after Debiting Previously Issued Provisional Credit Without Assessing Overdraft Fees**

106.    Regulation E requires financial institutions, when rescinding provisional credit, to inform consumers that it will honor checks, drafts, and preauthorized transfers for five business days after the notification without charging the consumer as a result of an overdraft. 12 C.F.R. § 1005.11(d)(2)(ii).

107.    Since May 24, 2021, where Comerica, through its Vendors, provided notices to Direct Express cardholders that provisional credit would be reversed, the transmittal letters did not clearly explain that Comerica would not assess overdraft fees for any preauthorized transfers it honored within the five-day grace period in more than 6,900 instances.

108.    Separately, in more than 360 instances during the time period of November 15, 2020 to January 10, 2021, Comerica, through its Vendors, failed to notify Direct Express cardholders that it was debiting previously issued provisional credit but would honor checks and drafts for five business days without assessing overdraft fees for any preauthorized transfers honored during that period.

### M. Comerica's Failure to Provide Cardholders with a Telephone Number and Address for Inquiries or Notices of Error on Periodic Statements

109.    Regulation E requires financial institutions to send out periodic statements for accounts to or from which electronic fund transfers can be made. 12 C.F.R. § 1005.9(b). Such statements must include the address and telephone number consumers need to use in order to make an inquiry or file a notice of error. The required phone number and address must be preceded by the phrase "Direct inquiries to" or similar language. 12 C.F.R. § 1005.9(b)(5). If, instead of providing oral or written notice that a preauthorized transfer to the consumer's account has or has not occurred, the financial institution provides consumers with an option to call a telephone number to determine whether the preauthorized transfer has occurred, the periodic

statement must also contain that telephone number. 12 C.F.R. § 1005.9(b)(6).

110.    From April 1, 2019 through October 31, 2020, Comerica, through its Vendors, provided more than 16,700 Direct Express cardholders with periodic statements that did not contain any contact information for the financial institution. Cardholders who received these statements were not provided with an address or phone number to use for inquiries or notices of error, nor were they provided a phone number to use to determine whether their preauthorized transfers occurred.

## COUNT I
### Violation of the CFPA (Unfairness)

**Comerica unfairly failed to provide consumers a reasonable way to obtain effective and timely assistance, interfering with consumers' ability to protect and access to their funds and to avail themselves of Regulation E's protections.**

111.    The Bureau realleges and incorporates by reference Paragraphs 1 through 110.

112.    The CFPA makes it unlawful for any covered person to engage in any unfair act or practice. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. *Id*. § 5531(c).

113.    Comerica's failure to provide Direct Express cardholders with timely and efficient assistance with their accounts has caused or was likely to cause substantial injury to cardholders.

114.    As outlined in paragraphs 25 to 61, the main way Direct Express cardholders obtain account services is by calling Comerica's Vendor-managed phone lines and speaking with a customer service representative. Since at least April 1, 2019, cardholders have had to wait long periods of time, or have had their calls repeatedly dropped, when calling to report

unauthorized transactions on their accounts, receive liability protection from such

transactions, or obtain help with other account problems that prevent them from accessing

their essential government benefits. Comerica's failures have also wasted cardholders' time

and likely have led some cardholders to give up on seeking assistance at all.

115.    Direct Express cardholders cannot reasonably avoid these injuries. Comerica

encourages cardholders to rely on its customer service phone lines for virtually all account

services. It advertises the phone line as the best option for getting help, will only accept notices

of error or requests to stop preauthorized payments through the phone line or mail, and offers

very few services through its Direct Express website or app. Further, cardholders do not get to

choose the financial institution that administers the Direct Express program or the Vendor

assigned to manage their account. Nor could cardholders reasonably anticipate that Comerica

would fail to ensure that the Vendors adequately staffed the customer service lines.

116.    The injury to Direct Express cardholders who have been forced to endure long

wait times and dropped calls is not outweighed by any benefit to consumers or competition.

Consumers do not benefit from being denied timely and efficient assistance or from

interference with their ability to protect and access their funds.

117.    Accordingly, Comerica's actions constituted unfair acts and practices, in violation

of the CFPA.

**<u>COUNT II</u>**
**Violation of the CFPA (Unfairness)**

**Comerica unfairly forced consumers to close their accounts and request new cards,
causing them to lose access to their accounts and incur fees instead of meeting its
obligation to honor stop payment requests.**

118.    The Bureau realleges and incorporates by reference Paragraphs 1 through 110.

119.    The CFPA makes it unlawful for any covered person to engage in any unfair act

or practice. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. *Id*. § 5531(c).

120.    As outlined in paragraphs 77 to 86, from April 1, 2019 through August 31, 2020, Comerica, through Vendor 2, did not honor any Direct Express cardholder requests to stop payment of preauthorized transfers even if they were timely submitted. In fact, Vendor 2 lacked the technological capability to stop such payments as required by law and promised in the Direct Express Terms. Instead, customer service representatives instructed cardholders to request a new card which would not have the preauthorization attached to it. In doing so, Comerica engaged in an unfair practice.

121.    The practice of requiring a request for a new card in order to stop payment of a preauthorized transfer caused or was likely to cause substantial injury to Direct Express cardholders. Cardholders who requested a new card lost access to their account and benefits for up to 10 days. Additionally, some Direct Express cardholders were charged fees for the issuance of the new cards as well as for expedited delivery if they sought to reduce the length of time they lost access to their accounts.

122.    Direct Express cardholders could not reasonably avoid these injuries. Cardholders do not get to choose the financial institution that administers the Direct Express program or the Vendor to which Comerica assigns their account for servicing. Nor could cardholders reasonably anticipate that Comerica would fail to ensure that its Vendors were able to implement the stop payment procedures outlined in the Direct Express Terms.

123.    Vendor 2's failure to honor timely submitted requests to stop-payment of

24

preauthorized transfers did not provide any benefit to Direct Express cardholders or to competition.

124.    Accordingly, Comerica's actions constituted unfair acts and practices, in violation of the CFPA.

## COUNT III
### Violation of the CFPA (Unfairness)

**Comerica unfairly failed to provide consumers with accurate and complete information after confirming instances of enrollment fraud.**

125.    The Bureau realleges and incorporates by reference Paragraphs 1 through 110.

126.    The CFPA makes it unlawful for any covered person to engage in any unfair act or practice. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. *Id*. § 5531(c).

127.    As outlined in paragraphs 62 to 66, from April 1, 2019 through at least September 6, 2024, Comerica, through Vendor 1, provided inaccurate and incomplete information to consumers who contacted Direct Express alleging that they had been fraudulently enrolled into the Direct Express program. Even where Vendor 1 determined that enrollment fraud had occurred, it sent the defrauded consumers incorrect response letters stating that "no error occurred." Comerica, through Vendor 1, also failed to inform the defrauded consumers that they needed to contact the paying government agency to remediate their losses. In doing so, Comerica engaged in an unfair practice.

128.    Vendor 1's incorrect response letters and failure to provide consumers with information about the existence of enrollment fraud and the proper remedy caused or was likely

to cause substantial injury to consumers. Consumers could reasonably interpret the denial letter's statement that no error occurred as the final disposition of their disputes and abandon their efforts to remedy the fraud. Thousands of consumers who had already been defrauded continued to lose government benefits, which were being distributed to the fraudulent enrollees, despite Vendor 1's determination that enrollment fraud had, in fact, occurred.

129.    Consumers could not reasonably avoid their injuries because Comerica, through Vendor 1, misled them about the findings of its investigations and withheld the information necessary for consumers to avoid or mitigate their losses.

130.    Comerica's failure to provide consumers with accurate and complete information regarding enrollment fraud provided no benefit to consumers or to competition.

131.    Accordingly, Comerica's actions constituted unfair acts and practices, in violation of the CFPA.

## COUNT IV
### Violation of the CFPA (Unfairness)

**Comerica unfairly charged cardholders ATM withdrawal fees that they did not owe.**

132.    The Bureau realleges and incorporates by reference Paragraphs 1 through 110.

133.    The CFPA makes it unlawful for any covered person to engage in any unfair act or practice. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. *Id*. § 5531(c).

134.    As outlined in paragraphs 67 to 76, since at least April 1, 2019, Comerica, through its Vendors, has charged Direct Express cardholders ATM withdrawal fees for transactions that should have been free according to the fee schedule sent to the cardholders, and

26

as required by Comerica's contract with Treasury. In doing so, Comerica engaged in an unfair practice.

135.    The practice of charging improper ATM withdrawal fees caused or was likely to cause substantial injury to Direct Express cardholders: for example, through its Vendors, Comerica has charged more than 1 million Direct Express cardholders ATM withdrawal fees for transactions that should have been free.

136.    Cardholders could not reasonably avoid their injuries. Cardholders do not get to choose the financial institution that administers the Direct Express program or the Vendor to which Comerica assigns their account for servicing. Nor could cardholders reasonably anticipate that Comerica or its Vendor would improperly count failed ATM withdrawal attempts against their entitlement to one free monthly ATM withdrawal, especially when Comerica, through its Vendor, represented that any ATM denial would be free.

137.    Comerica's improper charging of ATM fees did not provide any benefit to consumers or to competition.

138.    Accordingly, Comerica's actions constituted unfair acts and practices, in violation of the CFPA.

## COUNT V
### Violation of the EFTA

**Comerica required Direct Express cardholders to waive a right
conferred by the EFTA.**

139.    The Bureau realleges and incorporates by reference Paragraphs 1 through 110.

140.    Under the EFTA, no writing or agreement between a consumer and any other person, which includes a financial institution, may contain any provision which constitutes a waiver of any right conferred by the statute. 15 U.S.C. § 1693*l*.

141.    One such right is consumers' ability to stop a preauthorized transfer from the consumer's account by notifying the financial institution orally or in writing at least three business days before the scheduled date of the transfer. 15 U.S.C. § 1693e(a); 12 C.F.R. § 1005.10(c)(1).

142.    As outlined in paragraphs 77 to 86, from April 1, 2019 to December 1, 2020, Comerica, through its Vendors, included a provision in its Terms requiring Direct Express cardholders who were seeking to stop a preauthorized transfer to not only notify the Bank at least three business days before the date of transfer, but also to contact the merchant. Indeed, prior to July 2020, customer service representatives would not honor stop-payment requests unless the cardholder had already contacted the merchant.

143.    Comerica's requirement in its Terms that Direct Express cardholders contact the merchant in order to stop a preauthorized transfer constitutes a waiver of the right to do so solely by contacting the financial institution, in violation of the EFTA.

**COUNT VI**
**Violation of Regulation E**

**Comerica failed to honor timely submitted stop-payment requests**
**for preauthorized transfers.**

144.    The Bureau realleges and incorporates by reference Paragraphs 1 through 110.

145.    Under Regulation E, a consumer may stop payment of a preauthorized transfer from the consumer's account by notifying the financial institution at least three business days before the scheduled date of the transfer. 12 C.F.R § 1005.10(c)(1).

146.    As outlined in paragraphs 77 to 86, prior to August 31, 2020, Comerica, through its Vendors, failed to stop all timely submitted stop-payment requests on preauthorized transfers for Direct Express cardholders whose accounts were serviced by Vendor 2.

147.     Additionally, prior to July 2020, in certain instances Vendor 1's representatives refused to process timely submitted requests to stop payment on preauthorized transfers because the Direct Express cardholders had not contacted the merchant.

148.     Accordingly, Comerica failed to honor timely submitted stop-payment requests, in violation of Regulation E.

### COUNT VII
**Violation of Regulation E**

**Comerica failed to timely investigate notices of error.**

149.     The Bureau realleges and incorporates by reference Paragraphs 1 through 110.

150.     Under Regulation E, financial institutions are required to promptly investigate notices of error and determine whether an error occurred within 10 business days. 12 C.F.R. § 1005.11(c)(1). If a financial institution cannot complete its investigation within 10 business days, it may take up to 45 days to determine whether an error occurred, provided the financial institution provisionally credits the consumer's account in the amount of the alleged error. *Id*. § 1005.11(c)(2). For point-of-sale debit card transactions, such as those conducted with the Direct Express card, financial institutions may take up to 90 days to complete their investigation, if needed, provided they provisionally credit the consumer's account while completing the investigation. *Id*. § 1005.11(c)(3)(ii).

151.     As outlined in paragraphs 87 to 91, since April 1, 2019, Comerica, through its Vendors, failed to complete more than 19,900 investigations of Direct Express cardholders' notices of error within 10 business days for which they did not timely provide provisional credit.

152.     Additionally, since April 1, 2019, Comerica, through its Vendors, provided provisional credit but failed to complete more than 1,500 investigations of Direct Express

cardholders' notices of error within 90 calendar days.

153.    Accordingly, Comerica failed to timely investigate Direct Express cardholders' notices of error, in violation of Regulation E.

## COUNT VIII
### Violation of Regulation E

**Comerica failed to report the results of its investigations to cardholders.**

154.    The Bureau realleges and incorporates by reference Paragraphs 1 through 110.

155.    Under Regulation E, a financial institution must "report the results" of an investigation of a notice of error to the consumer within three business days of completing its investigation. 12 C.F.R. § 1005.11(c)(1), (c)(2)(iv).

156.    As outlined in paragraphs 92 to 96, in more than 220,000 instances, upon concluding their investigations of a notice of error, Comerica, through its Vendors, sent Direct Express cardholders a letter that failed to state that the claim had been denied and did not include sufficient information related to the results of the investigation.

157.    Accordingly, Comerica failed to report the results of its investigation to Direct Express cardholders, in violation of Regulation E.

## COUNT IX
### Violation of Regulation E

**Comerica failed to provide a written explanation of its findings after determining that no error or a different error occurred.**

158.    The Bureau realleges and incorporates by reference Paragraphs 1 through 110.

159.    Under Regulation E, where a financial institution completes an investigation following a notice of error and determines that no error occurred or a different error occurred from that described by the consumer, it must provide additional information to the consumer. 12 C.F.R. § 1005.11(d). In particular, the financial institution must provide a written explanation of

its findings and shall note the consumer's right to request the documents that the institution relied on in making its determination. *Id*. § 1005.11(d)(1).

160.    As outlined in paragraphs 97 to 99, in more than 140 instances, Comerica, through its Vendors, concluded an investigation and determined that no error occurred but failed to send the required written explanation to Direct Express cardholders.

161.    Additionally, in more than 220,000 instances, Comerica, through its Vendors, sent Direct Express cardholders notices that failed to state that the claim had been denied and did not include sufficient explanation of its findings related to the claim.

162.    Accordingly, Comerica failed to provide Direct Express cardholders with a written explanation of the findings of its investigation, in violation of Regulation E.

### COUNT X
### Violation of Regulation E

**Comerica failed to notify cardholders that provisional credit was made final.**

163.    The Bureau realleges and incorporates by reference Paragraphs 1 through 110.

164.    Under Regulation E, a financial institution's report to consumers regarding the results of its investigation of their notice of error must include, "if applicable, notice that a provisional credit has been made final." 12 C.F.R. § 1005.11(c)(2)(iv).

165.    As outlined in paragraphs 100 to 102, in more than 140 instances, Comerica, through its Vendors, failed to send the results of the investigation to Direct Express cardholders notifying them that their claims were approved and that previously issued provisional credit had been made final.

166.    Additionally, in more than 1,350 instances, Comerica, through its Vendors, sent notices to Direct Express cardholders that stated their claims were approved but the notices failed to inform Direct Express cardholders that their provisional credit was made final.

31

167.    Accordingly, Comerica failed to notify Direct Express cardholders that provisional credit was made final, in violation of Regulation E.

## COUNT XI
**Violation of Regulation E**

**Comerica failed to provide notification of the date and amount of the debiting of previously issued provisional credit.**

168.    The Bureau realleges and incorporates by reference Paragraphs 1 through 110.

169.    Under Regulation E, where a financial institution completes an investigation following a notice of error and determines that no error occurred or a different error occurred from that described by the consumer, it must follow certain procedures. 12 C.F.R. § 1005.11(d). In particular, if the financial institution is debiting a provisionally credited amount, the financial institution must notify the consumer of the date and amount of the debiting. *Id*. § 1005.11(d)(2)(i).

170.    As outlined in paragraphs 103 to 105, in more than 360 instances since November 15, 2020, Comerica, through its Vendors, failed to notify Direct Express cardholders that previously issued provisional credit had been reversed.

171.    Additionally, in more than 6,900 instances since May 24, 2021, where Comerica, through its Vendors, provided notice to Direct Express cardholders that previously issued provisional credit would be reversed such notice failed to include the specific date of the reversal.

172.    Accordingly, Comerica failed to provide Direct Express cardholders with notification of the date and amount of the debiting of previously issued provisional credit, in violation of Regulation E.

## COUNT XII
### Violation of Regulation E

**Comerica failed to notify consumers that it will honor checks, drafts, and preauthorized transfers for five business days after debiting previously issued provisional credit without charging overdraft fees.**

173.    The Bureau realleges and incorporates by reference Paragraphs 1 through 110.

174.    Under Regulation E, where a financial institution completes an investigation following a notice of error and determines that no error occurred or a different error occurred from that described by the consumer, it must follow certain procedures. 12 C.F.R. § 1005.11(d). In particular, if the financial institution is debiting a provisionally credited amount, the financial institution must notify the consumer that the institution will honor checks, drafts, or similar instruments payable to third parties and preauthorized transfers from the consumer's account for five business days after the notification ("five-day grace period"). *Id*. § 1005.11(d)(2)(ii). The financial institution must expressly notify the consumer that such charges will not result in an overdraft fee. *Id*.

175.    As outlined in paragraphs 106 to 108, when Comerica, through its Vendors, determined that no error occurred and were debiting a provisionally credited amount, in more than 360 instances, they failed to notify Direct Express cardholders that Comerica would honor checks, drafts, or similar instruments payable to third parties and preauthorized transfers from the consumer's account for the five-day grace period, and would not assess overdraft charges for any preauthorized transfers it honored within the five-day grace period. Separately, in more than 6,900 instances, Comerica, through its Vendors, sent cardholders notices that failed to explain that Comerica would not assess overdraft charges for any preauthorized transfers it honored within the five-day grace period.

176.    Accordingly, Comerica failed to notify Direct Express cardholders that all checks,

33

drafts, and preauthorized transfers it honored during the five-day grace period would not result in overdraft charges, in violation of Regulation E.

## COUNT XIII
### Violation of Regulation E

**Comerica failed to provide on periodic statements a telephone number and address to be used for inquiries or notices of error.**

177.    The Bureau realleges and incorporates by reference Paragraphs 1 through 110.

178.    Under Regulation E, financial institutions must send periodic statements for accounts to or from which electronic fund transfers can be made, and such periodic statements must contain "the address and telephone number to be used for inquiries or notices of errors, preceded by 'Direct inquiries to' or similar language." 12 C.F.R. § 1005.9(b)(5). And if the financial institution has chosen to allow consumers to determine by phone whether a preauthorized electronic fund transfer to their account has occurred, the statements must also include that telephone number. *Id*. § 1005.9(b)(6).

179.    As outlined in paragraphs 109 to 110, from April 1, 2019 through October 2020, Comerica, through its Vendors, provided periodic account statements to more than 16,700 Direct Express cardholders that did not contain the address and telephone number to be used for inquiries or notices of error. These statements also failed to include a telephone number the consumer could call to ascertain whether preauthorized transfers to the consumer's account have occurred.

180.    Accordingly, Comerica failed to provide Direct Express cardholders with a telephone number and address to be used for inquiries or notices of error on periodic statements, in violation of Regulation E.

### PRAYER FOR RELIEF

34

181.    WHEREFORE, the Bureau requests that this Court:

a.    Permanently enjoin Comerica from committing future violations of the
CFPA, the EFTA, and Regulation E;

b.    award such relief as the Court finds necessary to redress injury to
consumers resulting from Comerica's violations, including but not
limited to the refund of moneys paid, restitution, disgorgement or
compensation for unjust enrichment, and payment of damages;

c.    impose a civil money penalty against Comerica;

d.    awards the Bureau its costs in bringing this action; and

e.    award additional relief as the Court may determine to be just and proper.

Dated: December 6, 2024                    Respectfully submitted,

ERIC HALPERIN
Enforcement Director

RICHA SHYAM DASGUPTA
Deputy Enforcement Director

TIMOTHY M. BELSAN
Assistant Deputy Enforcement Director

 /s/ J. Khalid Hargrove
J. KHALID HARGROVE
Email: jimmy.hargrove@cfpb.gov
Phone: 202-595-4944
ALEX J. GRANT
Email: alex.grant@cfpb.gov
Phone: (212) 328-7040

Consumer Financial Protection Bureau
1700 G Street, N.W.
Washington, D.C. 20552

**ATTORNEYS FOR THE CONSUMER
FINANCIAL PROTECTION BUREAU**