## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>    Plaintiff,<br><br>   *v.*<br><br>COMERICA BANK,<br><br>    Defendant. | Case No. 3:24-cv-3054-B<br><br>Judge Jane J. Boyle |

## DEFENDANT COMERICA BANK'S
## <u>MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS</u>

MATTHEW P. PREVIN
(admitted *pro hac vice*)
matthewprevin@paulhastings.com
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: (202) 318-6049

JONICE M. GRAY
(admitted *pro hac vice*)
jonicegray@paulhastings.com
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1781

PAUL R. GENENDER
Texas Bar No. 00790758
paulgenender@paulhastings.com
PAUL HASTINGS LLP
2001 Ross Avenue, Suite #2700
Dallas, Texas 75201
Telephone: (972) 936-7500

***Counsel for Defendant Comerica Bank***

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

LEGAL STANDARD ........................................................................................................... 4

ARGUMENT ........................................................................................................................ 5

I.    The CFPB's Current Funding Mechanism Is Unconstitutional and Not in Accordance with the Law ................................................................................................. 5

II.    Count I Should Be Dismissed Because the CFPB's UDAAP Authority Does Not Extend to Oversight of Customer Service Call Wait Times ........................................... 9

III.    Counts II and III Should Be Dismissed Because the CFPB's Assertion of Its UDAAP Authority Is Inconsistent with EFTA .............................................................. 11

IV.    Counts I, II, and III Retroactively Apply New Statutory Interpretation to Past Conduct in Violation of Due Process ................................................................................................ 12

V.    The Complaint Fails To Allege Plausibly Any Violation of the CFPA, EFTA, or Regulation E ................................................................................................................. 14

    A.    The CFPB Fails To Allege Plausibly that Customer Service Call Wait Times Experienced by Some Direct Express Cardholders Were Unfair (Count I) ........ 15

    B.    The CFPB Fails To Allege Plausibly that Comerica's Practices Related to Stop Payment Requests Were Unfair (Count II) ....................................................... 16

    C.    The CFPB Fails To Allege Plausibly that Comerica's Handling of Alleged Enrollment Fraud Was Unfair (Count III) ........................................................ 17

    D.    The CFPB Fails To Allege Plausibly that Comerica's Assessment of ATM Withdrawal Fees Was Unfair (Count IV) ........................................................... 18

    E.    The CFPB Fails To Allege Plausibly that Comerica Required Cardholders to Waive a Right Conferred by EFTA (Count V) ................................................... 18

    F.    The CFPB Fails To Allege Plausibly that Comerica Failed To Honor Stop Payment Requests of Preauthorized Transfers (Count VI) .................................. 20

    G.    The CFPB Fails To Allege Plausibly that Comerica Failed To Report the Results of Investigations to Cardholders (Count VIII) .................................................... 21

H.    The Remaining Regulation E Claims Are Supported by Nothing More than Recitations of the Regulation and Naked Assertions (Counts VII and IX through XIII) ........................................................................................................ 22

VI.    The CFPB's Claims Are Untimely, at Least in Part .......................................... 22

A.    Counts I through IV Are Untimely in Part Under the CFPA's Three-Year Statute of Limitations ......................................................................................... 23

B.    Counts V-XIII Are Untimely in Whole or in Part Under EFTA's One-Year Statute of Limitations ......................................................................................... 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................4, 5, 21, 22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................... *passim*

*CFPB v. Active Network, LLC*,
No 4:22-cv-00898-ALM (E.D. Tex. Oct. 7, 2024), ECF No. 51...............................8

*CFPB v. Citizens Bank, N.A.*,
504 F. Supp. 3d 39 (D. R.I. 2020)...................................................................24, 25

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024)...................................................................................1, 5, 7

*CFPB v. Intercept Corp.*,
No. 3:16-cv-144, 2017 U.S. Dist. LEXIS 143789 .................................................15

*CFPB v. ITT Educ. Servs., Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015) ...............................................................25

*CFPB v. NDG Fin. Corp.*,
No. 15-cv-5211, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) .................................23

*CFPB v. Ocwen Fin. Corp.*,
No. 17-80495-civ, 2019 U.S. Dist. LEXIS 152336 (S.D. Fla. Sept. 5, 2019) ...............25

*CFPB v. PayPal, Inc.*,
No. 1:15-cv-01426-RDB, ECF No. 1, ¶ 70-75 (May 19, 2015) ...............................14

*CFPB v. Snap Fin. LLC*,
No. 2:23-cv-00462-JNP-JCB, 2024 U.S. Dist. LEXIS 136828 (D. Utah Aug.
1, 2024) ..................................................................................................24

*CFPB v. SoLo Funds, Inc.*,
2:24-cv-04108-RGK-AJR, 2024 U.S. Dist. LEXIS 189410 (C.D. Cal. Oct. 17,
2024) ......................................................................................................8

*Chamber of Comm. of the U.S. v. CFPB*,
691 F. Supp. 3d 730 (E.D. Tex. 2023)...............................................................9, 10

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012)...................................................................................2, 13

*Clark v. Martinez*,
   543 U.S. 371 (2005) ..................................................................................8

*Colonial Penn. Ins. Co. v. Market Planners Ins. Agency, Inc.*,
   1 F.3d 374 (5th Cir. 1003) ......................................................................23

*Davis v. HSBC Bank Nev., N.A.*,
   691 F. 3d 1152 (9th Cir. 2012) ...............................................................17

*Director, Office of Workers' Comp. Programs, Dep't of Labor v. Newport News
   Shipbuilding & Dry Dock Co.*,
   514 U.S. 122 (1995) ................................................................................10

*F.C.C. v. Fox TV Stations, Inc.*,
   567 U.S. 239 (2012) ................................................................................13

*Frame v. City of Arlington*,
   657 F.3d 215 (5th Cir. 2011) ..................................................................23

*FTC v. RCG Advances, LLC*,
   695 F. Supp. 3d 368 (S.D.N.Y. 2023) ....................................................17

*Haymore v. Amazon.com, Inc.*,
   No. 2:24-cv-729 TLN-SCR, 2024 U.S. Dist. LEXIS 210177 (E.D. Cal. Nov.
   19, 2024) ..................................................................................................10

*High Desert Relief, Inc. v. United States*,
   917 F.3d 1170 (10th Cir. 2019) ................................................................6

*Money v. City of San Marcos*,
   No. 24-50187, 2025 WL 429980 (5th Cir. Feb. 7, 2025) ........................20

*Off. of Pers. Mgmt. v. Richmond*,
   496 U.S. 414 (1990) ..................................................................................7

*PHH Corp. v. CFPB*,
   839 F.3d 1 (D.C. Cir. 2016) ....................................................................13

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) .............................................................................2, 11

*Reeside v. Walker*,
   52 U.S. 272 (1850) ....................................................................................7

*reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018) .............................................13

*Seila L. LLC v. CFPB*,
   591 U.S. 197 (2020) .............................................................................8, 13

*Smith v. BP Expl. & Prod.*,
   No. 23-30552, 2024 U.S. App. LEXIS 9528 (5th Cir. 2024) .................................................22

*Texas v. Colony Ridge, Inc.*,
   No. H- 24-0941 (S.D. Tex. Oct. 11, 2024), ECF No. 61 ..........................................................8

*Utility Air Regulatory Group v. EPA*,
   573 U.S. 302 (2014) ..................................................................................................................2

*Varity Corp.* v. *Howe*,
   516 U.S. 489 (1996) (Thomas, J., dissenting) ...........................................................................2

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ........................................................................................................2, 9, 10

**Statutes**

12 U.S.C. § 5481(12)(C) ...................................................................................................................24

12 U.S.C. § 5497 ......................................................................................................................1, 5, 8

12 U.S.C. § 5531 ................................................................................................................. *passim*

12 U.S.C. § 5564(g) ....................................................................................................................23, 24

15 U.S.C. § 45(a) .............................................................................................................................12

15 U.S.C. § 1607 .......................................................................................................................24, 25

15 U.S.C. § 1640 ..............................................................................................................................25

15 U.S.C. § 1681s(d) ........................................................................................................................24

15 U.S.C. § 1692l(b)(6) ...................................................................................................................25

15 U.S.C. § 1693 .................................................................................................................. *passim*

15 U.S.C. § 1693l ..............................................................................................................................18

*Wheeler-Lea Act*, ch. 49, § 3, 52 Stat. 111 (1938).........................................................................12

**Constitutional Provisions**

U.S. Const. amend. V.................................................................................................................12, 14

U.S. Const. art. I, § 9, cl. 7................................................................................................................5

## Rules

Fed. R. Civ. Proc. 12(b)(6) ................................................................................1, 20, 22

L.R. 7.1 ...................................................................................................................1

L.R. 7.2 ...................................................................................................................1

## Regulations

12 C.F.R. § 1005.6 ..................................................................................................12

12 C.F.R. § 1005.10 ........................................................................................... *passim*

12 C.F.R. § 1005.11 ....................................................................................12, 21, 22

12 C.F.R. § 1005.15 ................................................................................................12

## Other Authorities

CFPB, *CreditRepair.com and Lexington Law refund checks: What you need to know* (Dec. 5, 2024), available at https://www.consumerfinance.gov/about-us/blog/creditrepaircom-and-lexington-law-refund-checks-what-you-need-to-know/ ................................................................................................................13

Press Release, Fed. Rsrv., *Fed Rsrv. Bd. Announces Rsrv. Bank Income and Expense Data and Transfers to the Treasury for 2022* (last updated Jan. 13, 2023), https://tinyurl.com/ymrzcsfp ......................................................................6

Press Release, Fed. Rsrv., *Fed. Rsrv. Bd. Releases Ann. Audited Fin. Statements* (last updated Mar. 24, 2023), https://tinyurl.com/2xnjtywc ....................................6

Press Release, Fed. Rsrv., *Fed. Rsrv. Bd. Releases Ann. Audited Fin. Statements* (last updated Mar. 26, 2024), https://tinyurl.com/5xayzb38 ....................................6

CFPB, Policy Statement on Abusive Acts or Practices (April 3, 2023), *available at* https://www.consumerfinance.gov/compliance/supervisory-guidance/policy-statement-on-abusiveness/ ...........................................................13

Pursuant to Federal Rules of Civil Procedure 12(b)(6) and Local Rules 7.1 and 7.2, Defendant Comerica Bank ("Comerica" or the "Bank") hereby respectfully moves the Court to dismiss the Consumer Financial Protection Bureau's ("CFPB") Complaint. This Memorandum of Law ("Memorandum") is being filed concurrently with Comerica's Motion to Dismiss.

## INTRODUCTION

The Complaint drastically oversteps the bounds of the CFPB's constitutional and statutory authority while asserting a litany of claims that fail to adduce the requisite minimum factual allegations or support. For the following six reasons, this Court should reject the CFPB's attempt to extend its authority beyond the permissible scope of its authority, and dismiss the Complaint in its entirety.

*First*, the CFPB lacks authority to bring this enforcement action because the CFPB's funding mechanism currently violates both the Appropriations Clause and the CFPB's funding statute, the Dodd-Frank Act. The CFPB's "funding is . . . subject to the requirements of the Appropriations Clause," which requires "'Appropriation[s] made by Law.'" *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) (citation omitted). The Dodd-Frank Act authorizes the CFPB to draw funds from a specific source—"the combined *earnings* of the Federal Reserve System." 12 U.S.C. § 5497(a)(1) (emphasis added). But there are currently *no* earnings of the Federal Reserve upon which to draw because the Federal Reserve has not made a profit since 2022. Instead, the CFPB draws from the Federal Reserve's deficit, which is not authorized by the plain language of the governing law and unlawful under the Appropriations Clause.

*Second*, the CFPB's allegation that Comerica violated the Consumer Financial Protection Act's ("CFPA") prohibition on unfair, deceptive, and abusive acts or practices ("UDAAPs") by subjecting consumers to excessively long call wait times and related dropped calls is foreclosed by the CFPA. Congress in the CFPA did not vest the CFPB with discretion to declare any practice

a UDAAP, and the CFPB's attempt to characterize call wait times (and other customer service practices) as a "substantial injury" for the purposes of a putative unfairness claim under the CFPA (Count I) is not a reasonable (or permissible) interpretation of the statute. Support for such an expansive view of the CFPB's UDAAP enforcement authority must be set by "clear congressional authorization," *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (citing *Utility Air Regulatory Group v. EPA,* 573 U.S. 302, 324 (2014)), and the CFPB has pointed to none.

*Third*, the CFPB's allegation that Comerica violated the CFPA in connection with the Bank's handling of stop payment requests (Count II) and enrollment fraud (Count III) similarly fails. Stop payment requests, fraud, account enrollment, and government benefits in the context of electronic fund transfer systems are governed by the Electronic Fund Transfer Act ("EFTA"). *See, e.g.*, 15 U.S.C. §§ 1693e, 1693f. It is well settled that the obligations of a specific statute generally control over a more general statute, and "[t]hat is particularly true where . . . Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citing *Varity Corp.* v. *Howe*, 516 U.S. 489, 519 (1996) (Thomas, J., dissenting)). The CFPB cannot assert its UDAAP enforcement authority where Congress established EFTA as a comprehensive governing legal framework of electronic fund transfer systems.

*Fourth*, even if the CFPA's UDAAP prohibition could be interpreted to cover the conduct at issue in Counts I-III, such interpretations would represent a sudden departure from the historic understanding of the CFPA. The application of such novel interpretations violates Comerica's due process rights, which requires agencies to "provide regulated parties fair warning of the conduct [a regulation] prohibits or requires." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (internal quotation marks and citation omitted) (alteration in original).

*Fifth*, the Complaint fails to supply sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Each Count, therefore, must be dismissed.

*Sixth*, the CFPB's claims are time-barred in whole or in part.

## BACKGROUND

Through the Direct Express program, recipients of federal financial benefits (*e.g.*, social security payments) can open a prepaid debit card account to receive and use benefit disbursements electronically. Compl. ¶ 2. Comerica, a Texas banking association headquartered in Dallas, has administered the Direct Express program on behalf of the U.S. Department of Treasury's Bureau of the Fiscal Service ("BFS") since 2008. *Id*. ¶¶ 2, 12.  In that time, Comerica has facilitated the distribution of billions of dollars in federal benefits to millions of Americans. *Id*. ¶ 18.

Comerica's administration of Direct Express is governed by a contract between the Bank and BFS that dictates required services and service level requirements ("SLRs"), among other key terms. *Id*. ¶ 31. Comerica utilizes two third-party vendors to assist the Bank with the administration of Direct Express, including card issuance, cardholder servicing, and dispute handling. *Id*. ¶ 20.

The specific features of federal benefit disbursement create unique challenges for Comerica and its third-party vendors. The disbursement period for federal benefits is concentrated into a nine-day window each month (the "Disbursement Period"). *Id*. ¶ 29. This means that money is deposited into the accounts of millions of consumers at the same time every month. This concentration of deposits leads to a spike in the volume of calls to Direct Express customer service phone lines. *Id.* Approximately 60% to 70% of the calls to the customer service phone lines are made during the Disbursement Period. *Id.*

Comerica and its third-party vendors implement a variety of strategies for handling these surges in customer service calls in a manner consistent with Comerica's commitments to BFS. For

example, one of Comerica's vendors uses a dynamic tool during periods of excessive customer service call volume. *Id.* ¶ 39. The tool, known as "Heavy Queue," responds to certain categories of calls by directing that caller via an automated message to visit the vendor's website or mobile application, or call back at a later time. *Id.* ¶ 43-44. Cardholders receive the Heavy Queue message only after indicating, via automated options, that the purpose of the call is of a lower-priority type, such as a balance inquiry. *Id.* Heavy Queue is not used for comparatively urgent calls, including those governed by regulatory requirements (*e.g.*, filing a dispute or reporting a lost or stolen debit card). *Id.* ¶ 43.

BFS extensively monitors Comerica's customer service performance and compliance with regulatory requirements. BFS reviews monthly reports from Comerica related to SLR performance on topics such as customer service call wait times, call abandonment rates, and compliance with certain requirements under Regulation E, the implementing regulation for EFTA. *Id.* ¶ 31. BFS also controls the operation of the Direct Express program by issuing directives, which can require Comerica to take specific actions. With the benefit of this oversight and knowledge of Comerica's operations, BFS has chosen to retain Comerica as administrator of the Direct Express program for over 17 years. *Id.* ¶ 2.

Second-guessing BFS' oversight, the CFPB seeks to improperly substitute its own. In 2021, the CFPB commenced an investigation of Comerica's administration of Direct Express. On November 8, 2024, Comerica filed a complaint against the CFPB seeking relief from the CFPB's unlawful investigation. On December 6, 2024, the CFPB filed this enforcement action against Comerica alleging violations of the CFPA, EFTA, and Regulation E.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[L]abels and conclusions" and "naked assertion[s]" devoid of "further factual enhancement" are not enough. *Twombly*, 550 U.S. at 555, 557. Likewise, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

I.    **The CFPB's Current Funding Mechanism Is Unconstitutional and Not in Accordance with the Law**

The Court should dismiss this entire lawsuit because the Complaint suffers from a critical, foundational defect: the CFPB's current funding mechanism is invalid. Even if the CFPB could state plausible claims for relief, the Bureau may not pursue those claims using funds requisitioned in violation of the Appropriations Clause and the CFPB's enabling statute, the Dodd-Frank Act.

The Supreme Court has confirmed that the CFPB's "funding is . . . subject to the requirements of the Appropriations Clause." *Cmty. Fin. Servs.*, 601 U.S at 425. The Appropriations Clause requires that executive agencies be funded by "[a]ppropriation[s] made by Law." *Id.* (quoting U.S. Const. art. I, § 9, cl. 7). Here, that law is the Dodd-Frank Act, which, as the Supreme Court explained, "authorizes the [CFPB] to draw public funds from a particular source—'the combined *earnings* of the Federal Reserve System.'" *Id.* at 435 (quoting 12 U.S.C. §§ 5497(a)(1), (2)(A)–(B)) (emphasis added). Those "combined earnings" are "surplus funds in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury." *Id.* at 425 (citation omitted). In other words, the earnings that must fund the CFPB (if at all) are the Federal Reserve's revenues *in excess of its expenditures*.

"Earnings" is defined regularly as net income or profit in dictionaries and under generally accepted accounting principles. *See Earnings*, Oxford Dictionary of Accounting (45th ed. 2016) (defining "earnings" as "[t]he net income or profit of a business"); *5.8 Retained Earnings, Fin. Statement Acct. Guide*, PricewaterhouseCoopers, https://tinyurl.com/4er6t478 ("Retained

5

*earnings* represents the earned capital of the reporting entity. . . that develops and builds up over time from *profitable operations*. It consists of all undistributed *income* that remains invested . . . .") (emphasis added). Likewise, when determining earnings before interest, taxes, depreciation, and amortization (the "EBITDA" metric in accounting and financial modeling), "earnings" necessarily refers to profit. *See, e.g.*, Nasdaq, *Glossary of Stock Market Terms*, EBITDA, https://tinyurl.com/4e8wtpmx (last visited Dec. 16, 2024) (May 31, 2024) (defining "earnings" as the "operating and nonoperating profit before the deduction of interest and income taxes").

The CFPB's current funding, therefore, is not drawn from its authorized source—the Federal Reserve's earnings—because there are *no* earnings of the Federal Reserve System upon which to draw. The Federal Reserve has not made a profit since 2022 because of the rise in interest rates, and has been operating at a loss since then. *See* Press Release, Fed. Rsrv., *Fed. Rsrv. Bd. Releases Ann. Audited Fin. Statements* (last updated Mar. 26, 2024), https://tinyurl.com/5xayzb38 (indicating that the Federal Reserve System's 2023 deficit was $114.3 billion); Press Release, Fed. Rsrv., *Fed. Rsrv. Bd. Releases Ann. Audited Fin. Statements* (last updated Mar. 24, 2023), https://tinyurl.com/2xnjtywc ("CFPB 2022 Fin. Statements Press Release") ("During 2022, the Reserve Banks . . . first suspended weekly remittances to the Treasury and began accumulating a deferred asset, which totaled $16.6 billion by the end of the year.").[1] Thus, the Federal Reserve's expenses have exceeded its revenue, and no funds exist that would otherwise be destined for deposit into the Treasury's general fund. Instead, the CFPB has drawn funding from the Federal Reserve's *deficit* account. *See* Press Release, Fed. Rsrv., *Fed Rsrv. Bd. Announces Rsrv. Bank Income and Expense Data and Transfers to the Treasury for 2022* (last updated Jan. 13, 2023),

---

[1] It is well established that courts may "take judicial notice of official government publications." *High Desert Relief, Inc. v. United States*, 917 F.3d 1170, 1175 n.1 (10th Cir. 2019) (citation omitted).

https://tinyurl.com/ymrzcsfp ("the Reserve Banks were assessed . . . $0.7 billion to fund the operations of the [CFPB]"); CFPB 2022 Fin. Statements Press Release ("audited financial statements of the Reserve Banks" include "assessments of $2.8 billion for Board expenses, currency costs, and the operations of the [CFPB]").

Payments "in direct contravention of the federal statute" violate the Appropriations Clause. *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990). No extra-statutory funding is permitted where "Congress has appropriated no money for the payment[s]," because "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Id.* at 424-25; *see also Reeside v. Walker*, 52 U.S. 272, 291 (1850) (refusing to order payment of a claim against the United States in view of "the want of any appropriation by Congress to pay th[at] claim").[2]

Here, no statute authorizes the Federal Reserve to incur debt to ensure that the CFPB continues to operate. Nor could a statute do so, because the Appropriations Clause does not permit Congress to fund an executive agency not from the general Treasury fund (or revenue that would go into that fund) but on another agency's credit card.  The CFPB's unique, statutorily authorized funding mechanism, designed to avoid the need for annual appropriations, is only constitutional insofar as it permits the CFPB to draw funds from money the Federal Reserve would have otherwise deposited into the Treasury—the Federal Reserve's "earnings." *Cmty. Fin. Servs.*, 601 U.S. at 425. When that statutorily designated source remains dry, the CFPB's funding  has  not been "sanctioned" by Congress,  *Reeside*, 52 U.S.  at  291,  and  is therefore unconstitutional.

---

[2] This requirement applies not only to "'all the taxes raised from the people,'" but also to "'revenues arising from other sources.'" *Richmond*, 496 U.S. at 427 (citation omitted). Accordingly, "not a dollar of" public money "can be used in the payment of anything not thus previously sanctioned" by Congress, because "[a]ny other course would give to the fiscal officers a most dangerous discretion." *Reeside*, 52 U.S. at 291.

The Dodd-Frank Act expressly contemplates that where the "sums available to the [CFPB]" from the Federal Reserve are "not . . . sufficient to carry out [its] authorities," the CFPB may seek appropriations directly from Congress. 12 U.S.C. §5497(e)(1).[3] The CFPB could, therefore, have requisitioned Congress for additional funding notwithstanding the absence of Federal Reserve earnings. Yet, the CFPB has never done so.

Absent a change in law or another authorization request, Congress has appropriated no other money for funding the CFPB; it expressly designated in the Dodd-Frank Act that the CFPB will be funded only from the Federal Reserve's *earnings*. By funding the CFPB from the Federal Reserve's *debt*, the CFPB is violating its own enabling statute.[4] As such, any action that the CFPB takes using such unappropriated funds—such as prosecuting this lawsuit—is unlawful. In these circumstances, where the CFPB's funding is both unconstitutional and unauthorized by Congress, the "appropriate disposition would be to reverse . . . and dismiss the case." *Seila L. LLC v. CFPB*, 591 U.S. 197, 233 (2020).[5]

---

[3] The CFPB may argue that this reading of the statute would require it to "predict" future shortfalls, but that is precisely how agency funding appropriations typically work; an agency reports to Congress indicating how much money it needs and then Congress appropriates some or all of the requested amount. Just because the CFPB's typical funding mechanism is through the Federal Reserve's surplus does not mean that the CFPB is excused from standard norms and practices, and it has statutory authority to seek additional direct appropriations.

[4] Under the canon of constitutional avoidance, which "allows courts to avoid the decision of constitutional questions," *Clark v. Martinez*, 543 U.S. 371, 381 (2005) (emphasis omitted), the Court here may decide this issue on statutory grounds by ruling that the CFPB's current funding scheme violates the congressional mandate that it is to be funded only from the Federal Reserve's "earnings." 12 U.S.C. § 5497(a)(1).

[5] The CFPB may seek to rely on three recent decisions that rejected challenges to the CFPB's funding, but these decisions are not informative. *CFPB v. Active Network, LLC,* No 4:22-cv-00898-ALM (E.D. Tex. Oct. 7, 2024), ECF No. 51 at 3, provided no reasons for denying a request to dismiss. In *Texas v. Colony Ridge, Inc.*, No. H- 24-0941 (S.D. Tex. Oct. 11, 2024), ECF No. 61 at 9, *memorandum and recommendation adopted* (S.D. Tex. Nov. 26, 2024)—a State of Texas CFPA enforcement action in which the CFPB is not a party—the court ruled that, unlike Comerica here, the defendant failed to "explain how funding for . . . an agency is tied to its lawful ability to act." Finally, in *CFPB v. SoLo Funds, Inc.*, 2:24-cv-04108-RGK-AJR, 2024 U.S. Dist. LEXIS 189410, *5–6 (C.D. Cal. Oct. 17, 2024), the court similarly provided no explanation for rejecting the funding challenge, stating only that it was "not persuaded . . . that the [CFPB's] source of funding—even if illegitimate—is grounds for dismissal."

**II.      Count I Should Be Dismissed Because the CFPB's UDAAP Authority Does Not Extend to Oversight of Customer Service Call Wait Times**

Through Count I, the CFPB alleges that Comerica violated the CFPA's UDAAP prohibition by unfairly failing to provide consumers with sufficient customer service. Compl. ¶¶ 111-117. The CFPB's allegation is based on call wait times and dropped calls that purportedly prevented consumers from accessing their funds and "wasted [their] time." *Id.* ¶ 114. The CFPB asks the Court to grant it unprecedented authority to police customer service call wait times as a potential UDAAP. Such an expansive view of the CFPB's UDAAP authority must be supported by "clear congressional authorization." *West Virginia v. EPA*, 597 U.S. at 723. The CFPB has not pointed to such authorization, and the statute precludes such an expansive interpretation. The Court should therefore dismiss Count I.

Congress did not delegate to the CFPB unfettered discretion to declare any practice a UDAAP and thereby impose potentially crippling penalties for engaging in that putatively illegal practice. Just over a year ago, another court in this District struck down a similar attempt by the CFPB to expand the scope of the UDAAP prohibition and its authority. *See Chamber of Comm. of the U.S. v. CFPB*, 691 F. Supp. 3d 730, 43 (E.D. Tex. 2023) (rejecting the CFPB's attempt to declare discriminatory conduct a UDAAP). The CFPB's asserted authority to police customer service call wait times finds no support in the applicable statute.

The CFPA grants the CFPB the authority to take action "to prevent a covered person or service provider from committing or engaging in [a UDAAP] under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a). The statute defines "unfairness" to mean an act or practice that causes or is likely to cause consumers substantial injury that they cannot reasonably avoid and is not outweighed by countervailing benefits to consumers or competition. *Id.* § 5531(c). The UDAAP prohibition does not reference the type of customer

service issues—such as call wait times—that the CFPB proclaims "unfair" in its Complaint. *See generally* 12 U.S.C. § 5531. Comerica is aware of no case in which a federal court has endorsed the application of the CFPA's UDAAP prohibition to reach customer service call wait times that are allegedly too long as a permissible exercise of the Bureau's statutory authority. In fact, courts have rejected, as a matter of law, attempts to allege inadequate customer service as an unfair practice under state corollaries. *See, e.g., Haymore v. Amazon.com, Inc.*, No. 2:24-cv-729 TLN-SCR, 2024 U.S. Dist. LEXIS 210177, at *19 (E.D. Cal. Nov. 19, 2024) ("Failing to provide adequate customer service is, as a matter of law, not an unfair business practice").

Given the CFPA's silence, this Court should not be the first to interpret the statute as authorizing the CFPB's expansive claim of authority over customer service issues. The consequences would be drastic for the industry. Financial services companies would be compelled to invest significant resources into compliance programs in an effort to comply with the CFPB's unilateral expectations. *See Chamber of Commerce*, 691 F. Supp. 3d at 740 (emphasizing "the millions of dollars per year spent by companies attempting to comply" with the CFPB's UDAAP rule at issue).[6] In fact, since the availability of customer phone support affects nearly every consumer, one would expect the CFPA to provide a "clear congressional authorization" for the CFPB's oversight authority over such a ubiquitous feature of everyday life. *West Virginia*, 597 U.S. at 723. The Court should reject the CFPB's unsupported claim of authority and dismiss Count I.

_____

[6] That is particularly so when the financial services company is administering a federal program and its actions are already overseen by another federal agency (here, the BFS) with authority to require specific corrective actions. *Supra* at 4 (describing the BFS's oversight and control of Comerica). The CFPB's attempt to impose through litigation more onerous requirements than those demanded by the BFS would essentially "put the federal courts into the regular business of deciding intrabranch and intraagency policy disputes—a role that would be most inappropriate." *Director, Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 129 (1995).

**III.     Counts II and III Should Be Dismissed Because the CFPB's Assertion of Its UDAAP Authority Is Inconsistent with EFTA**

Counts II and III of the Complaint allege that Comerica engaged in unfair acts or practices in violation of the CFPA in connection with the Bank's (or its vendor's) handling of stop payment requests and enrollment fraud, respectively. Compl. ¶¶ 118-131. Congress enacted EFTA to address these topics. The CFPB cannot interpret the UDAAP prohibition to circumvent the will of Congress. The Court should reject the CFPB's attempt to do so and dismiss Counts II and III.

When enacting EFTA in 1968, Congress noted that "the unique characteristics of [electronic systems to transfer funds]" render "the application of existing consumer protection legislation . . . unclear, leaving the rights and abilities of consumers, financial institutions, and intermediaries in electronic fund transfers undefined." 15 U.S.C. § 1693(a). The purpose of EFTA is to provide a "basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." *Id.* § 1693(b).

It is well established that the obligations of a specific statute generally control over a more general statute, and "[t]hat is particularly true where . . . 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'" *RadLAX Gateway Hotel, LLC*, 566 U.S. at 645. This canon also operates to avoid "the superfluity of a specific provision that is swallowed by a general one . . . ." *Id.*. The CFPB asks the Court to authorize the swallowing of EFTA by the CFPA's UDAAP prohibition.

The framework established by EFTA covers the activity the CFPB attempts to shoehorn under its UDAAP authority through Counts II and III. Specifically, the statute and the regulation reflect the rights and responsibilities of consumers and financial institutions in connection with

stop payments, fraud, account enrollment, and the transfer of government benefits.[7] EFTA also includes, in addition to sections related to civil and criminal liability, an administrative enforcement mechanism that empowers the CFPB to enforce the requirements of the law. *See* 15 U.S.C. § 1693o(a)(5). The CFPB ignores this framework, instead claiming that conduct related to these topics should be governed by the CFPA's general UDAAP prohibition. 12 U.S.C. § 5531(a). This would render EFTA largely superfluous, and cannot be what Congress intended.[8]

The Court should not permit the CFPB to substitute the judgment of Congress for its own. Given that EFTA comprehensively regulates the electronic fund and remittance transfer systems, Congress could not have intended to superimpose the CFPB's UDAAP enforcement provisions over this regulatory framework. The Court should dismiss Counts II and III.

## IV. Counts I, II, and III Retroactively Apply New Statutory Interpretation to Past Conduct in Violation of Due Process

Even if the CFPA's UDAAP prohibition could be interpreted to cover the conduct at issue in Counts I, II, and III, such interpretations would not be grounded in precedent and would represent a sudden departure from the historic understanding of the statute. The application of such novel interpretations violates Comerica's Fifth Amendment due process rights.

"The fundamental principle that laws regulating persons or entities must give fair notice of what conduct is required or proscribed . . . is essential to the protections provided by the Fifth

---

[7] *See, e.g.*, stop payment provisions (15 U.S.C. § 1693e(a); 12 C.F.R. § 1005.10(c)), unauthorized transfers (*e.g.*, fraud) provisions (15 U.S.C. §§ 1693f, 1693g; 12 C.F.R. §§ 1005.6 and 1005.11), provisions containing requirements for account enrollment (15 U.S.C. § 1693c), and provisions related to the transfer of government benefits (12 C.F.R. § 1005.15).

[8] As stated above, when enacting EFTA in 1968, Congress stated that "the unique characteristics of [electronic systems to transfer funds]" render "the application of existing consumer protection legislation . . . unclear, leaving the rights and abilities of consumers, financial institutions, and intermediaries in electronic fund transfers undefined." 15 U.S.C. § 1693(a). There has been a federal ban on unfair and deceptive acts or practices since 1938. *See Wheeler-Lea Act*, ch. 49, § 3, 52 Stat. 111 (1938) (current version at 15 U.S.C. § 45(a)). In other words, the "existing consumer protection legislation" that Congress deemed insufficient for the purposes of governing electronic fund transfer systems included the same type of ban on unfair acts or practices that the CFPB seeks to apply in Counts II and III.

Amendment's Due Process Clause . . . which requires the invalidation of impermissibly vague laws." *F.C.C. v. Fox TV Stations, Inc.*, 567 U.S. 239, 240 (2012) (internal quotation marks and citations omitted). Due process therefore requires agencies to "provide regulated parties fair warning of the conduct [a regulation] prohibits or requires." *Christopher*, 567 U.S. at 156 (internal quotation marks and citation omitted) (alteration in original).  An "agency should not change an interpretation in an adjudicative proceeding where doing so would impose new liability on individuals for past actions which were taken in good-faith reliance on agency pronouncements." *Id.* at 156-57 (internal quotation marks, alterations, and citation omitted). An agency's retroactive application of a new statutory or regulatory interpretation to a party's conduct without fair notice violates that party's due process rights.[9]

The CFPB failed to provide requisite fair notice to Comerica prior to initiating its investigation that it would interpret the CFPA's UDAAP prohibition to permit its policing of customer service call wait times, stop payment requests, and enrollment fraud. The CFPB cannot point to any timely and relevant public actions that would have put Comerica on notice that it considered long customer service call wait times to be within the scope of the UDAAP prohibition.[10] The only potentially relevant actions occurred well after the beginning of the time period at issue in the Complaint (*i.e.*, April 2019) and none was tested in court.[11] The CFPB has

---

[9] *See, e.g.*, *PHH Corp. v. CFPB*, 839 F.3d 1, 46 (D.C. Cir. 2016) (vacating an order following an enforcement action where the Department of Housing and Urban Development sought retroactively to prohibit conduct it had previously permitted), *reinstated in relevant part on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018), *abrogated on other grounds*, *Seila L. LLC v. CFPB*, 591 U.S. 197 (2020).

[10] In fact, in its own engagements with consumers, the CFPB seems to find long customer service wait times to be acceptable. *See* CFPB, *CreditRepair.com and Lexington Law refund checks: What you need to know* (Dec. 5, 2024), available at https://www.consumerfinance.gov/about-us/blog/creditrepaircom-and-lexington-law-refund-checks-what-you-need-to-know/ (FAQs including request for consumers to "[p]lease be patient and keep in mind that customer service wait times may be long due to the large number of check recipients").

[11] *See, e.g.*, Consent Order, *In the Matter of Bank of America, N.A.*, File No. 2022-CFPB-0004, ¶¶ 59-75 (July 14, 2022); CFPB, Policy Statement on Abusive Acts or Practices (April 3, 2023), *available at* https://www.consumerfinance.gov/compliance/supervisory-guidance/policy-statement-on-abusiveness/ (policy statement that cited "time spent trying to obtain customer support assistance" as a consumer interest for the purposes

never publicly pursued a UDAAP claim in connection with the processing of consumer requests to stop preauthorized payments. To the contrary, the CFPB has pursued claims related to such conduct as violations of EFTA and Regulation E. *See, e.g.*, Consent Order, *In the Matter of USAA Federal Savings Bank*, File No. 2019-BCFP-0001, ¶¶ 12-22 (Jan. 3, 2019) (finding the failure to honor stop payment requests to be a violation of EFTA and not UDAAP). Finally, with respect to enrollment fraud, Comerica is not aware of any instance in which the CFPB has pursued publicly a UDAAP claim for the type of conduct alleged in Count III.[12]

In sum, the CFPB provided little or no notice of the novel interpretations of the CFPB's UDAAP prohibition that underpin Counts I, II, and III. Where the CFPB did take action that could be considered notice, the action was not timely. As a result, Counts I, II, and III violate Comerica's Fifth Amendment due process rights and should be dismissed.

## V.     The Complaint Fails To Allege Plausibly Any Violation of the CFPA, EFTA, or Regulation E

Each of the Counts in the Complaint alleges a violation of the CFPA, EFTA, or Regulation E but, in every instance, fails to supply sufficient facts to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The Court, therefore, should dismiss all Counts.

---

of the definition of an "abusive act or practice" under the CFPA). The CFPB filed a complaint in 2015 citing the inability to reach customer service representatives as one of numerous facts in support of an allegation of an abusive practice. *See* Complaint, *CFPB v. PayPal, Inc.*, No. 1:15-cv-01426-RDB, ECF No. 1, ¶ 70-75 (May 19, 2015). But the *PayPal* complaint would not constitute adequate notice to Comerica given the other factors involved in the allegation—*e.g.*, the providing of misinformation to consumers by customer service representatives. *Id.* In addition, the inability to reach customer service representatives was not part of the stipulated order that resolved the case. *See,* Stipulated Final Judgment and Order, *CFPB v. Paypal, Inc.*, No. 1:15-cv-01426-RDB, ECF. 7, (May 19, 2015). The CFPB also issued a consent order finding that failure to properly prepare for a failed system conversion that, among other things, strained customer service capabilities amount to an unfair act or practice. *See* Consent Order, *In the Matter of UniRush LLC and Mastercard International Incorporated*, File No. 2017-CFPB-0010, ¶¶ 28-36 (Feb. 1, 2017). This action also does not provide fair warning given the unique circumstance of the customer service failures—*e.g.*, the inadvertent deactivation or failure to properly transfer thousands of cards accounts.

[12] While the CFPB has applied the UDAAP prohibition to conduct related to unauthorized enrollment in services or opening of accounts, that is materially different than the subject of the CFPB's allegation in this case. *See, e.g.*, Consent Order*, In the Matter of Wells Fargo Bank, N.A.*, 2016-CFPB-0015, ¶¶ 16-37 (finding the unauthorized enrollment in online bank services and the unauthorized opening of deposit, credit cards, and debit cards by the financial institution to be unfair and/or abusive).

A. The CFPB Fails To Allege Plausibly that Customer Service Call Wait Times Experienced by Some Direct Express Cardholders Were Unfair (Count I)

An act or practice is "unfair" under the CFPA only if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and . . . such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1). The CFPB's allegations with respect to customer service call wait times do not meet those criteria. Out of the millions of consumers that receive benefits to a Direct Express prepaid card, the CFPB supplies two instances to support its conclusory allegations that consumers were substantially injured by long call wait times. Compl. ¶¶ 58-59. But the Complaint contains no factual allegations supporting key elements of its claim—that call wait times comprised substantial consumer injury or that any substantial injury was not outweighed by countervailing benefits. *See CFPB v. Intercept Corp.*, No. 3:16-cv-144, 2017 U.S. Dist. LEXIS 143789, at *11 ("Although the complaint contains several allegations that Intercept engaged in or assisted in unfair acts or practices, it never pleads facts sufficient to support the legal conclusion that consumers were injured or likely to be injured. Nothing in the complaint allows the defendants or the court to ascertain whether any potential injury was or was not counterbalanced by benefits to the consumers at issue.").

Additionally, contrary to the CFPB's assertions that calls disconnected via Heavy Queue harmed consumers (Compl. ¶¶ 39, 116), the opposite is true: the tool provided a substantial *benefit* to consumers by ensuring higher priority requests for customer service during times of heavy call volume remained in the queue for a more expeditious response. Cardholders receive the Heavy Queue message only after indicating, via automated options, that the purpose of the call is of a lower-priority type, such as a balance inquiry, relative to other purposes. This practice has substantially benefitted consumers by ensuring that higher priority requests receive faster access

15

to customer service representatives. Moreover, those consumers with lower-priority needs are directed to the website where they can also obtain assistance.

In short, the facts alleged in the Complaint do not meet the elements for finding an "unfair" act or practice. Count I must be dismissed.

B. The CFPB Fails To Allege Plausibly that Comerica's Practices Related to Stop Payment Requests Were Unfair (Count II)

Count II alleges that Comerica violated the CFPA by unfairly forcing consumers to close their accounts and request new cards, causing them to lose access to their accounts and incur fees instead of meeting its obligation to honor stop payment requests. Compl. ¶ 120-124. The facts provided in the Complaint do not state the elements of an unfairness claim.

An act or practice is not "unfair" if the associated harm is "reasonably avoidable." 12 U.S.C. § 5531(c)(1)(A). With respect to Count II, any alleged harm to consumers was reasonably avoidable. Consumers could have avoided losing access to their accounts by notifying the merchant rather than closing their account. Compl. ¶ 83. Alternatively, even if consumers chose to close their account to effectuate the stop payment, they could mitigate the effects of the temporary loss of access by taking out funds or making payments prior to the account closure. Consumer could also have avoided fees by notifying the merchant rather than closing their account. Additionally, even if consumers chose to close their account, they did not necessarily pay the card replacement fee (*id*. ¶ 85) and they could choose not to pay for expedited delivery.

An act or practice is also not "unfair" if the alleged injury is outweighed by countervailing benefits to consumers. *See* 12 U.S.C. § 5531(c)(1). Providing consumers with the options of contacting the merchant or closing their account to stop a preauthorized payment undoubtedly benefits consumers. Not all financial institutions or service providers possess the capability to implement a stop payment request—a fact that is acknowledged in the CFPB's official commentary on Regulation E. *See* 12 C.F.R. Part 1005, Supp. I, cmt. 10(c)-3. The approach

criticized by the CFPB allowed consumers to stop preauthorized payments, in many cases, without cost. Any cost that was incurred, in time or money, was outweighed by the benefit of effectuating the consumer's stop payment request. Count II must be dismissed.

C.  The CFPB Fails To Allege Plausibly that Comerica's Handling of Alleged Enrollment Fraud Was Unfair (Count III)

Count III alleges that Comerica unfairly failed to provide consumers with accurate and complete information after confirming instances of enrollment fraud. Compl. ¶ 127-131. The Complaint asserts that, after investigating an allegation of enrollment fraud from a consumer and finding that fraud occurred, one of Comerica's vendors sent a letter noting that "the transaction(s) in question were not unauthorized; therefore no error occurred." *Id.* ¶ 63. Only consumers who call the vendor's "customer service phone line in response to receiving the denial letter are informed about the occurrence of enrollment fraud and receive information about how to remedy the problem." *Id.* ¶ 65. Even if taken as true, these facts do not support a plausible unfairness claim because the alleged injury was reasonably avoidable.

"An injury is reasonably avoidable if consumers have reason to anticipate the impending harm and the means to avoid it, or *if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact.*" *FTC v. RCG Advances, LLC*, 695 F. Supp. 3d 368, 387 (S.D.N.Y. 2023) (citing *Davis v. HSBC Bank Nev., N.A.*, 691 F. 3d 1152, 1168-69 (9th Cir. 2012)) (internal quotation marks omitted) (emphasis added). Here, the allegedly impacted consumers could reasonably avoid the injury asserted by the CFPB.

Cardholders who contacted the vendor in this context were clearly aware that an account had been opened in their name—otherwise they would not have contacted the vendor. It is also reasonable to expect that the consumers would know the source of the government benefit they should be receiving (*i.e.*, the relevant agency). The CFPB suggests that the vendor should have "inform[ed] the consumer that they needed to contact the government entity paying the benefits at

issue to recover any benefits that may have been stolen." Compl. ¶ 64. The average consumer would be aware of, and reasonably capable of pursuing, that potential avenue for mitigating any potential injury. The fact that consumers could reasonably avoid the injury alleged by the CFPB means that the conduct cannot be "unfair." Therefore, Count III should be dismissed.

D. The CFPB Fails To Allege Plausibly that Comerica's Assessment of ATM Withdrawal Fees Was Unfair (Count IV)

Count IV alleges that Comerica unfairly assessed consumers ATM fees in violation of the CFPA. Compl. ¶¶ 134-138. This allegation is flawed because consumers could reasonably avoid the ATM fees. An act or practice is not "unfair" if the associated harm is "reasonably avoidable." 12 U.S.C. § 5531(c)(1). In this instance, the consumers could reasonably avoid the ATM fee by not attempting to withdraw money when their account did not contain sufficient funds. As the CFPB admits, consumers can use the Direct Express website or phone application to check their account balance. Compl. ¶ 27. Given the ease with which consumers could obtain balance information, they could easily avoid the fees associated with a failed transaction. Therefore, the facts alleged by the CFPB do not satisfy the criteria of an unfair act or practice under the CFPA, and Count IV should be dismissed.

E. The CFPB Fails To Allege Plausibly that Comerica Required Cardholders to Waive a Right Conferred by EFTA (Count V)

Count V alleges that Comerica violated the anti-waiver provision of EFTA, 15 U.S.C. § 1693l, because a past version of the Direct Express Terms of Use ("TOU") contained a requirement purportedly constituting a waiver of the right to stop a preauthorized transfer. Compl. ¶ 143. The CFPB's allegation is not supported by Regulation E or its own official commentary.

EFTA states that "[n]o writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by [EFTA]." 15 U.S.C. § 1693l. Under EFTA, "[a] consumer may stop payment of

a preauthorized electronic fund transfer by notifying the financial institution orally or in writing at any time up to three business days preceding the scheduled date of such transfer." *Id.* § 1693e(a). The Complaint alleges that the inclusion of language in an old version of the TOU instructing consumers to notify the merchant in connection with a request to stop a preauthorized payment constituted a waiver of the right to stop preauthorized payments in violation of EFTA anti-waiver provision. Compl. ¶¶ 142-143. Neither the language cited by the CFPB nor the surrounding sentences support the conclusion that consumers any rights under EFTA or Regulation E.

A consumer's right to stop a preauthorized payment is reflected in Regulation E. 12 C.F.R. § 1005.10(c). The CFPB's official interpretation of that provision states: "The institution may confirm that the consumer has informed the payee-originator of the revocation (for example, by requiring a copy of the consumer's revocation as written confirmation to be provided within 14 days of an oral notification)." 12 C.F.R. Part 1005, Supp. I, cmt. 10(c)-2. If, under the CFPB's official interpretation, a financial institution may "require[e] a copy of the consumer's revocation" as "confirmation that the consumer has informed the payee-origination" (*e.g.*, merchant) of the stop payment, it logically follows that the financial institution may require the consumer to inform the merchant of the stop payment. Any other reading would render the official commentary nonsensical. Far from being a waiver, the sentence cited by the CFPB is simply a reflection of the regulation and the CFPB's own guidance.

The language surrounding the requirement cited by the Bureau further supports the conclusion that it is not a waiver. The consumer's right to stop a preauthorized payment is clearly stated in the preceding sentences. *See* Declaration of Jennifer of Gehr in Support of Motion To Dismiss, Ex. A-1 (TOU).[13] The remainder of the language surrounding the requirement is drawn

---

[13] The Complaint extensively references the TOU, and Count V is based on disclosures in the TOU. When ruling on Comerica's motion to dismiss, the Court may, therefore, properly consider the document as incorporated by reference

from the text of 15 U.S.C. § 1693e(a) or informs the consumer that Comerica may try to implement the requested stop payment even if the request does not comply with statutory timing requirements—none of which suggests the consumer has waived any right.

The language cited by the CFPB cannot be a waiver because it is simply a restatement of the CFPB's official interpretation of Regulation E. Count V should be dismissed.

F.   The CFPB Fails To Allege Plausibly that Comerica Failed To Honor Stop Payment Requests of Preauthorized Transfers (Count VI)

Count VI alleges that Comerica violated Regulation E by failing to honor timely submitted stop-payment requests. Compl. ¶¶ 146-148. In support of this claim, the Complaint alleges that prior to July 2, 2020, Vendor 1 failed to process stop payment requests unless the consumer making the request indicated they had already contacted the merchant. *Id.* ¶ 81. The Complaint also states that prior to August 31, 2020, Vendor 2 processed stop payment requests by closing the Direct Express prepaid card account and issuing a new account number and card because the Vendor lacked the capability to implement stop preauthorized payment requests. *Id.* ¶¶ 82-83. Even if these facts are taken as true, they do not support a plausible allegation of a Regulation E violation.

As stated above, requiring a consumer to contact a merchant in connection with a request to stop a preauthorized payment is consistent with the CFPB's official commentary. *See* 12 C.F.R. Part 1005, Supp. I, cmt. 10(c)-2. Therefore, even if Vendor 1 required the consumer to indicate they had contacted the merchant, it would not constitute a violation of Regulation E.

The alleged conduct of Vendor 2, as described in the Complaint, also falls short of a Regulation E violation as it is consistent with CFPB's official commentary, which states:

> If an institution does not have the capability to block a preauthorized debit from being posted to the consumer's account - as in the case

---

in the complaint.   *See, e.g., Money v. City of San Marcos*, No. 24-50187, 2025 WL 429980, at *4 (5th Cir. Feb. 7, 2025) ("When determining whether a plaintiff's claims satisfy Rule 12(b)(6), our review includes documents that the complaint incorporates by reference.").

> of a preauthorized debit made through a debit card network or other system, for example - the institution may instead comply with the stop-payment requirements by using a third party to block the transfer(s), as long as the consumer's account is not debited for the payment. 12 C.F.R. Part 1005, Supp. I, cmt. 10(c)-3.

This commentary indicates that an institution that lacks the ability to implement stop payment requests may comply with the requirement so long as the consumer's account is not debited. The CFPB does not allege consumers' accounts were debited for the relevant payments under Vendor 2's alleged approach. Because the alleged conduct underlying the CFPB's Count VI is permissible under the CFPB's own official commentary, the claim should be dismissed.

G. <u>The CFPB Fails To Allege Plausibly that Comerica Failed To Report the Results of Investigations to Cardholders (Count VIII)</u>

Count VIII alleges that Comerica violated Regulation E by failing to report the results of its investigations of notices of error to consumers. Compl. ¶ 157. The Complaint contains almost no factual support for this allegation. The support it does include, even if taken as true, is insufficient to "state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S.at 678.

Under Regulation E, a financial institution must "report the results" of an investigation of a notice of error within three business days after completing its investigation. 12 C.F.R. §§ 1005.11(c)(1); § 1005.11(c)(2)(iv). The CFPB asserts that Comerica violated this requirement by (1) "fail[ing] to send responses to consumers reporting the results of investigations" and (2) sending letters to consumers that did not explicitly state that the claim was "approved or denied." Compl. ¶¶ 93-95. The first of these assertions is a "naked assertion[s]" devoid of "further factual enhancement," and so is insufficient to support a plausible claim. *Twombly*, 550 U.S. at 555, 557. The second assertion also does not support a plausible claim because neither Regulation E nor the CFPB's official commentary prescribes specific information or sets a level of detail required to "report the results" of an investigation.

The letter cited by the CFPB "informed the Direct Express cardholders that it 'found a conflict in the information provided by [the consumer] and the information resulting from our research' and that it 'cannot confirm that fraud occurred.'" Compl. ¶ 95. These statements accurately "report the results" of an investigation, which is what is required under Regulation E. Nowhere in the regulation or the CFPB's official commentary does it state that a "report of results" must include the words "approved" or "denied" as the CFPB suggests in the Complaint. *Compare* Compl. ¶¶ 94-95, *with* 12 C.F.R. § 1005.11. The statement cited by the CFPB constitutes a "report" and the Regulation requires nothing more. As a result, the CFPB has failed to state a plausible claim and Count VIII should be dismissed.

H. <u>The Remaining Regulation E Claims Are Supported by Nothing More than Recitations of the Regulation and Naked Assertions (Counts VII and IX through XIII)</u>

Counts VII and IX through XIII each allege violations of specific Regulation E provisions. Compl. ¶¶ 153, 167, 172, 176, and 180. With respect to each of those Counts, the Complaint does not provide any factual support for the CFPB's claim, but rather recites the relevant Regulation E requirement and states that Comerica failed to comply. *See, e.g.*, Compl. ¶¶ 87-91, 150-153 (in support of Claim VII, a restatement of the Regulation E requirements regarding a timely investigation of a notice of error and a statement that Comerica failed to comply). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. A complaint must contain "enough factual matter (taken as true)" to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. As a result, Counts VII and IX through XIII must be dismissed.

VI.    **The CFPB's Claims Are Untimely, at Least in Part**

"A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *Smith v. BP Expl. & Prod.*, No. 23-30552, 2024 U.S. App. LEXIS 9528, *4

(5th Cir. 2024) (citation and quotation marks omitted). Each of the CFPB's claims is barred in whole or in part.

A.   <u>Counts I through IV Are Untimely in Part Under the CFPA's Three-Year Statute of Limitations</u>

Under the CFPA, "no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1). "The date of discovery is the date when the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *CFPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL 7188792, at *19 (S.D.N.Y. Dec. 2, 2016) (internal quotation marks and citation omitted). With respect to discovery, a plaintiff must "plead sufficient facts to put the defense on notice of the theories on which the complaint is based." *Colonial Penn. Ins. Co. v. Market Planners Ins. Agency, Inc.*, 1 F.3d 374, 376 (5th Cir. 1003) (internal quotation marks and citation omitted) (discussing pleading requirements applicable to the "discovery rule" in federal court). "A complaint may be subject to dismissal if its allegations affirmatively demonstrate that the plaintiff's claims are barred by the statute of limitations and fail to raise some basis for tolling." *Frame v. City of Arlington,* 657 F.3d 215, 240 (5th Cir. 2011).

The Complaint alleges violations of the CFPA based on conduct that occurred more than three years prior to the filing of the Complaint. *See, e.g.*, Compl. ¶ 120. Even accounting for the time period subject to the parties' tolling agreements,[14] claims based on such conduct would be time-barred unless the CFPB can raise a basis for tolling—*i.e.*, that it discovered the conduct more recently. The complaint does not "plead sufficient facts to put the defense on notice" of any basis for tolling. *Colonial Penn. Ins. Co.*, 1 F.3d at 376. As a result, taking into account the time period

---

[14] The CFPB and Comerica agreed to toll the statute of limitations for any CFPA or EFTA claim related to the CFPB's investigation for a total of one year, one month, and 15 days.

subject to the parties' tolling agreements, any CFPB claim is untimely as to alleged conduct occurring prior to October 2020. Therefore, Count II should be dismissed while Counts I, III, and IV should be dismissed in part.

B.  Counts V-XIII Are Untimely in Whole or in Part Under EFTA's One-Year Statute of Limitations

An EFTA or Regulation E claim (Counts V through XIII) must be filed "within one year from the date of the occurrence." 15 U.S.C. § 1693m(g). Therefore, any of the CFPB's EFTA or Regulation E claims related to conduct prior to December 6, 2023—*i.e.*, one year prior to the filing of the CFPB's Complaint—are untimely.

The CFPA's statute of limitations does not apply because the claims contained in Counts V through XIII arise solely under EFTA. The CFPA's statute of limitations includes the caveat that "[a]n action arising under this title does not include claims arising solely under enumerated consumer laws" and "[i]n any action arising solely under an enumerated consumer law, the Bureau may commence, defend, or intervene in the action in accordance with the requirements of that provision of law, as applicable." 12 U.S.C. § 5564(g)(2)(A)-(B). In other words, if a CFPB action arises solely under an enumerated law, the statute of limitations of that law applies. EFTA is an "enumerated consumer law" and Counts V through XIII arise solely thereunder. Consequently, EFTA's statute of limitations applies. *Id.* § 5481(12)(C).

Other enumerated consumer laws include provisions that explicitly state that a violation of the respective law is a violation of the CFPA. *See, e.g.*, 15 U.S.C. § 1607(b). Courts have relied on those provisions to find that the CFPA's statute of limitations applied to CFPB actions based on violations of those enumerated consumer laws.[15] In contrast, EFTA *does not* state that a violation

---

[15] *See, e.g., CFPB v. Snap Fin. LLC*, No. 2:23-cv-00462-JNP-JCB, 2024 U.S. Dist. LEXIS 136828, at *35-36 (D. Utah Aug. 1, 2024) (citing 15 U.S.C. § 1681s(d) in holding that CFPA statute of limitations applied to CFPB action for violations of the Fair Credit Reporting Act); *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 49 (D. R.I. 2020) (citing

of EFTA is a violation of the CFPA. *Id.* § 1693o(b). Therefore, EFTA's statute of limitations must apply.[16] This means that Counts V, VI, and XIII are untimely and should be dismissed in their entirely while Counts VII through XII are at least partially barred.

Alternatively, even if the Court determines that the CFPA's statute of limitations applies to the CFPB's EFTA and Regulation E claims, Counts V through XIII are wholly or partially barred. As stated above, under the CFPA, taking into account the time period subject to the parties' tolling agreements, any CFPB claim is untimely as to alleged conduct occurring prior to October 2020.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

---

15 U.S.C. § 1607 in holding that CFPA statute of limitations applied to CFBP action for violations of Truth in Lending Act); *CFPB v. Ocwen Fin. Corp.*, No. 17-80495-civ, 2019 U.S. Dist. LEXIS 152336, at *67-75 (S.D. Fla. Sept. 5, 2019) (citing 15 U.S.C. § 1692l(b)(6) and 15 U.S.C. § 1607(a)(6) in holding that CFPA statute of limitations applied to CFPB actions for violations of the Fair Debt Collection Practices Act and TILA).

[16] The CFPB may argue that the statute of limitations contained in EFTA only applies to private actions and not those of the CFPB. This argument has already been rejected by at least one court examining an analogous provision in the TILA. *See CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 922 (S.D. Ind. 2015) (finding that 15 U.S.C. § 1640 applies to a CFPB action arising under the CFPA) *but see Citizens Bank, N.A.*, 504 F. Supp. 3d at 48-49 (finding "much of the ITT court's reasoning . . . unconvincing").

DATED this 21st day of February, 2025.    Respectfully submitted,

MATTHEW P. PREVIN
(admitted *pro hac vice*)
  matthewprevin@paulhastings.com
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: (202) 318-6049

JONICE M. GRAY
(admitted *pro hac vice*)
  jonicegray@paulhastings.com
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1781

  */s/ Paul R. Genender*
PAUL R. GENENDER
(Texas Bar No. 00790758)
  paulgenender@paulhastings.com
PAUL HASTINGS LLP
2001 Ross Avenue, Suite 2700
Dallas, Texas 75201

Telephone: (972) 936-7500

*Counsel for Defendant Comerica Bank*

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was electronically filed with the Clerk of Court via the CM/ECF system, and was electronically served on all known counsel of record on this the 21st day of February 2025.

  */s/ Paul R. Genender*
Paul R. Genender