# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>        Plaintiff,<br><br>     v.<br><br>COMERICA BANK,<br><br>        Defendant. | Case No. 3:24-cv-03054-B<br><br>Judge Jane J. Boyle |

## <u>AMENDED COMPLAINT</u>

1.      The Consumer Financial Protection Bureau (Bureau) brings this action against Comerica Bank (Comerica or the Bank) under Sections 1031, 1036, 1054, and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a)(1)(A)-(B), 5564, and 5565; the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693 *et seq.*; and its implementing Regulation E, 12 C.F.R. pt. 1005, Subpart A.

2.      Created in 2007 to reduce the reliance on paper checks, the U.S. Department of the Treasury's Direct Express Debit Mastercard (Direct Express) program makes federal benefit payments available electronically to millions of senior citizens, veterans, disabled Americans, and other beneficiaries via prepaid debit cards. Direct Express participants are generally unbanked individuals who depend on the benefits they receive to pay for housing, utilities, transportation, and other essential expenses.

3.      From 2008 to January 2025, Comerica contracted with the Treasury Department's Bureau of the Fiscal Service (BFS) to serve as the exclusive administrator for the Direct Express program. Direct Express cardholders have their benefits loaded onto the prepaid cards issued by

1

Comerica and contact Comerica for all day-to-day issues with the card, including any concerns about fraudulent transactions, stolen or lost cards, or an inability to access their funds.

4.      In its administration of the Direct Express program, Comerica and its Vendors must comply with applicable statutes and regulations designed to protect consumers, including in particular the EFTA and Regulation E. The primary purpose of the EFTA and Regulation E is the provision of individual consumer rights and ensuring protection of consumers engaging in electronic fund transfers.

5.      Since 2019, however, Comerica has repeatedly failed to comply with the protections set out in the EFTA and Regulation E in connection with Direct Express cardholders. For example, Comerica failed to honor cardholders' timely requests to cancel preauthorized transfers (like an automatically recurring cell phone bill), failed to timely investigate cardholders' notices of error, and failed to honor cardholders' timely stop-payment requests.

6.      Additionally, in numerous instances since April 2019 Comerica has impeded Direct Express cardholders' efforts to dispute unauthorized transfers and internal errors affecting the funds in their accounts and to seek liability protection from unauthorized transfers as provided in Regulation E.

7.      Comerica also provided consumers who contacted the Bank alleging they had been fraudulently enrolled into the Direct Express program with inaccurate and incomplete information regarding the claimed fraud, impairing the consumers' understanding of the nature of the fraud and the steps needed to address it.

8.      Comerica, through its Vendors, also charged more than one million Direct Express cardholders ATM fees to access their government benefits in situations where the

cardholders were entitled to free withdrawals.

9.      As detailed below, Comerica's conduct in administering the Direct Express program violates the EFTA's prohibition on waiving consumers' rights conferred by the statute, numerous requirements of Regulation E, and the CFPA's prohibition on unfair acts or practices.

10.     The Bureau seeks injunctive and other equitable relief to address and remedy Comerica's unlawful conduct, redress and damages for injured consumers, and a civil money penalty.

## JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

12.     Venue is proper in this district because Comerica is located, resides, and does business in this district. 12 U.S.C. § 5564(f); 28 U.S.C. § 1391(b)(1).

## PARTIES

13.     The Bureau is an independent agency of the United States charged with regulating "the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491(a). The Bureau has independent litigating authority, 12 U.S.C. § 5564(a)-(b), including the authority to enforce the EFTA, Regulation E, and the CFPA, and to secure appropriate relief for violations of those provisions, 12 U.S.C. §§ 5481(12)(C) and (14), 5565.

14.     Comerica is a Texas banking association headquartered in Dallas, Texas. Comerica is a subsidiary of Comerica Incorporated, one of the largest banking associations in the

country.

15.     Comerica is a "covered person" pursuant to 12 U.S.C. § 5481(6)(A) because it offers and provides consumer financial products or services, as defined under 12 U.S.C. § 5481(5). Relevant to this action, Comerica engages in deposit-taking activities, transmits or exchanges funds, and otherwise acts as a custodian of funds or any financial instrument for use by or on behalf of consumers primarily for personal, family, or household purposes. 12 U.S.C. § 5481(15)(A)(iv).

16.     Comerica is also a "financial institution" subject to the EFTA and Regulation E because it is a national bank holding consumer deposit accounts. 15 U.S.C. § 1693a(9); 12 C.F.R. § 1005.2(i).

## FACTUAL ALLEGATIONS

### A. Direct Express Program

17.     In 2007, BFS established the Direct Express program to replace paper benefit checks with electronically transmitted benefits. Through this program, recipients of certain benefits—federal and state-disbursed Social Security and supplemental security income (SSI) for adults and children with disabilities, veterans' pension and education assistance, civil service retirement, and compensation for coal workers with black lung disease, among others—can receive their benefits on a prepaid debit card.

18.     Since 2013, with limited exceptions, federal beneficiaries have had only two options for how to receive their benefit payments: through a Direct Express card or direct deposit to a bank account.

19.     In 2019, due to complaints from veterans about fraud in and other problems with the Direct Express program, the Department of Veterans Affairs created a program that offers

free checking accounts to veterans, thereby allowing most veterans to avoid reliance on Direct Express. Federal beneficiaries without a bank account, however, must receive their benefits via a Direct Express card.

20.     From January 2008 to January 2025, Comerica had an exclusive contract with BFS to administer the Direct Express program by providing the prepaid Direct Express card and associated account services to enrollees in the program. In exchange, BFS pays Comerica a fee for every beneficiary who enrolls in the Direct Express program.

21.     When it was the exclusive administrator, Comerica provided around $3 billion in benefits annually to approximately 3.4 million Direct Express cardholders.[1]

**B. Direct Express Cardholders' Rights Under Regulation E**

22.     Like all consumers, Direct Express cardholders have certain rights and protections under the EFTA and Regulation E. These rights include the rights listed in paragraphs 23-27, below.

23.     Under 12 C.F.R. § 1005.6(b), cardholders may limit their liability for unauthorized transfers to $50 (or to the amount of transfers prior to providing notice, if that amount is lower) if they notify Comerica within two business days after learning they have lost their cards or their cards have been stolen.

24.     Under 12 C.F.R. § 1005.10(c)(1), cardholders are entitled to stop payment of any preauthorized transfers from their accounts by notifying Comerica orally or in writing at least three business days before the scheduled date of the transfer.

25.     Under 12 C.F.R. § 1005.11(b), cardholders have the right to trigger an investigation by Comerica of an unauthorized transfer or error if they provide Comerica with oral

---

[1] Although its contract with BFS was not renewed, Comerica continues to service Direct Express accounts as the program is transitioned to the new Direct Express administrator.

or written notice within 60 days or receiving a statement reflecting the error.

26.     Under 12 C.F.R. § 1005.11(c), cardholders are entitled to have that investigation completed within 10 business days of their providing notice of that error. If Comerica is unable to complete its investigation within those 10 days, it can extend that deadline to 45 days, but only if it provides a provisional credit to the cardholder in the amount of the error, subject to certain limited exceptions.

27.     Under 12 C.F.R. § 1005.11(d), cardholders are entitled to notice from Comerica of the results of any investigation, and if Comerica determines that no error or a different error occurred than the one asserted by the cardholder, the cardholder is entitled to "a written explanation of the institution's findings" that "shall note the consumer's right to request the documents that the institution relied on in making its determination." If Comerica debits a provisional credit that had been provided, it must notify the cardholder of the date and amount of the debiting, and that it will honor checks, similar instruments, and preauthorized transfers from the customer's account, without assessing an overdraft charge, for five business days after the notification, to the extent it would have paid any amounts had the provisionally credited funds not been debited.

28.     Comerica is responsible for ensuring that Direct Express cardholders are able to exercise these rights in a timely fashion to protect their accounts from unauthorized transfers and dispute any internal errors related to their accounts. Comerica is also responsible for providing reasoned explanations for any decisions by Comerica related to cardholders' exercise of these rights.

29.     As described above, in order to preserve certain rights, consumers must have the ability to contact Comerica within a certain period of time (e.g., two business days after the loss

of a card, or three business days before a previously scheduled transfer). Consumers also need the ability to contact Comerica promptly to trigger certain obligations on the Bank that begin from the date on which consumer contacts it (e.g., Bank must complete investigation within 10 business days of consumer's notice of error).

### C. Comerica's Use of Vendors for Account Services

30.     Comerica's contract with BFS allows the Bank to use contractors to perform services under the agreement but stipulates that Comerica is responsible for the acts or omissions of the contractors as if the acts or omissions were its own. Under the terms of its contract with BFS, Comerica is responsible for the supervision and management of its Vendors and is required to remove and replace any Vendor that fails to perform satisfactorily.

31.     Comerica has outsourced the performance of many account services subject to the EFTA and Regulation E to two vendors: Vendor 1 and Vendor 2 (collectively, "the Vendors"). These services include providing cardholders disclosures and account statements; issuing and funding cards; stopping preauthorized transfers at the cardholder's request; call monitoring and complaint management; and resolving notices of error by providing provisional credit, performing investigations, communicating these investigations' results to cardholders, and correcting errors.

32.     When Comerica was the exclusive administrator for the Direct Express program, Vendor 2 performed account services for a few hundred thousand cardholders accounts, while Vendor 1 performed account services for the remaining millions of accounts.

33.     The Vendors also each manage a version of Comerica's customer service phone line, providing infrastructure for the phone line and recruiting, training, and paying the customer service representatives who field cardholder inquiries and complaints.

34.     Though Comerica has outsourced a number of the Direct Express program's cardholder services to the Vendors, it cannot outsource its obligations to administer the program in compliance with Regulation E, the EFTA, and the CFPA. Comerica must ensure that its Vendors comply with these laws or be liable for their failures.

**D. Comerica Encourages Cardholders to Use Its Customer-Service Phone Line for Account Services and to Invoke Certain Consumer Protection Rights**

35.     Direct Express cardholders rely on Comerica's customer service phone lines for their day-to-day account services, including to invoke certain rights under the EFTA and Regulation E.

36.     Under Regulation E, certain protections for cardholders are dependent on the consumer providing prompt notice to the Bank, and certain obligations for the Bank flow from the date on which it receives notice from a cardholder of the issue. (*See* Section B, *supra*).

37.     Since at least April 1, 2019, Comerica has advertised its customer service phone lines as the best way to contact the Bank. In the Direct Express welcome letter and Terms of Use Comerica sends to new cardholders, the Bank touts that the phone line is available "24 Hours a Day / 7 Days a Week" to address any questions or concerns the cardholder may have.

38.     By Comerica's design, the customer service phone lines are cardholders' most convenient option to assert consumer protection rights. For example, the Bank will only accept Regulation E notices of error or requests to stop preauthorized payments through the phone line or the mail. Although Comerica does currently offer certain automated options on its phone line, as well as a Direct Express website and app, cardholders cannot use these methods to access Regulation E's protections. They can only use the website and app for basic services like checking their account balances, ordering replacement cards, and changing their contact information. And until 2022, the website and app only allowed cardholders to view their account

information. To avail themselves of Regulation E protections by, for instance, filing a notice of error, initiating a stop payment request, or cancelling a preauthorized transfer, cardholders had to call or write the Bank.

39.    When calling into Comerica's customer service phone lines, however, Direct Express cardholders regularly have difficulty reaching Comerica.

40.    Indeed, some Direct Express cardholders who call Vendor 1's customer service phone line never reach a representative because Vendor 1 repeatedly and involuntarily disconnects their calls. Vendor 1, unlike Vendor 2, does not offer to call cardholders back when call volumes are high. To reduce wait times during high call volume periods, Vendor 1 instead automatically and intentionally drops any call that it determines does not concern a limited set of topics, using a function called Heavy Queue. Heavy Queue is activated based on the raw number of calls already in queue or when call volume is elevated relative to the number of available customer service representatives.

41.    Before September 2019, Heavy Queue, when active, dropped *all calls*. Since that time, Heavy Queue drops calls based on the issues Vendor 1 determines cardholders are calling about.

42.    When Direct Express cardholders call Vendor 1's phone line, they first encounter an automated phone tree that asks them to identify, from a provided set of topics, the nature of their call.

43.    Currently, when Heavy Queue is active, cardholders will be placed in a queue to wait for the next available customer service representative if they select the topics for reporting an expired, lost, or stolen card; attempting to stop a preauthorized payment; inquiring about a card blocked due to suspected fraud; or calling about new disputes.

44.     Cardholders who do not select one of the foregoing options will hear a recorded message that indicates the Bank is "experiencing heavy call volumes," directs them to use the website or try calling back later, and then disconnects the call. The recorded message does not provide information about when a customer service representative will become available, nor does it prompt the caller to request a call back from a representative.

45.     Comerica knows that Vendor 1 has used Heavy Queue since 2013 and, to date, has continually allowed it to do so.

46.     From April 1, 2019 to June 30, 2023, Vendor 1 dropped almost 25 million calls with its Heavy Queue function—3.5 million more calls than it answered.

47.     Even though Vendor 1 uses Heavy Queue to manage high call volumes, call wait times for cardholders who do not have their calls disconnected are frequently long, with some cardholders waiting several hours to speak with a customer service representative.

48.     These long waits can occur any time during the month and adversely impact cardholders' attempts to assert their rights under Regulation E and the EFTA.

49.     For example, in March, April, and May 2022, cardholders calling into the Vendor 1- and Vendor 2-managed phone lines waited over an hour, on average, to speak with a customer service representative. During these same months, some cardholders waited for as long as two-and-a-half hours to speak with a customer service representative. Many cardholders hang up, unable to wait that long on the phone.

50.     Direct Express cardholders have frequently complained about their lengthy waits. In June 2019 alone, Comerica received 274 complaints from cardholders unable to reach Vendor 1—some of whom reported waiting four hours to reach a representative. In July 2019, the Bank

received 358 similar complaints. As recently as at least September 2023, cardholders continued to face hours-long waits on the customer service phone lines.

51.     Because of their issues reaching Comerica, some of these cardholders have had to call repeatedly—over hours, days, and sometimes months—to reach a customer service representative.

52.     Direct Express cardholders with Vendor 1-managed cards also sometimes call Comerica directly because they cannot get through via Vendor 1's phone line. When this happens, Comerica assesses whether they are calling to report a Regulation E error; if so, it will connect them directly to Vendor 1.

53.     Comerica regularly receives calls from cardholders who cannot get through to Vendor 1 to report a Regulation E error. Comerica knows these cardholders often had to wait long periods of time or have had their call repeatedly dropped when trying to alert Comerica about unauthorized transfers on their accounts, receive provisional and final credit for such transfers, report lost cards and other account problems that prevent them from using their funds, or otherwise obtain account assistance.

54.     Due to concern that the inaccessibility of Vendor 1's phone line may be causing Comerica to miss resolution deadlines required by Regulation E, Comerica created a separate, dedicated phone line to backchannel these cardholders directly to Vendor 1 beginning around February 2021. Since creating the separate phone line, Comerica has received calls every month from cardholders who need to report Regulation E errors but cannot reach a customer service representative via Vendor 1's phone line. The overwhelming majority of these cardholders called to report unauthorized transfers on their accounts.

55.    Comerica's failure to ensure that its Vendors provide timely and effective assistance to Direct Express cardholders interferes with cardholders' ability to invoke the protections to which they are entitled under the EFTA and Regulation E and to protect and access their funds. For example, these failures delay or prevent cardholders from receiving protection from and compensation for unauthorized transfers, and from otherwise receiving access to their government benefits.

56.    Many Direct Express cardholders are beneficiaries of federal programs for retirees and individuals unable to work due to disability and thus have little income. Indeed, government benefits are some cardholders' sole source of income. Losing access to these benefits, even temporarily, can leave cardholders unable to pay for housing, utilities, food, and other necessities. The same is true when cardholders' funds are stolen through unauthorized transfers.

57.    For example, one cardholder attempted to contact Comerica because she had ordered a replacement card but never received it. The cardholder, who has a hearing and speech impediment, had a personal representative assist her. They each called Comerica for assistance at least three times a week for three months, at times waiting almost an hour to speak with a customer service representative. The cardholder eventually had to open a bank account to get access to her funds because she had not received her replacement card; in the meantime, she could not pay her rent or utilities, had her electricity turned off and incurred a turn-on fee, and had to take out an $800 loan from her personal representative.

58.    Another cardholder received a letter from Direct Express informing her that a different Vendor would be managing her account and that she would be receiving a new card in the mail the following month. After not receiving a new card she called Vendor 1's phone line every day for a month, and then every other day for the next two months, because Heavy Queue

repeatedly dropped her calls. She had no access to her benefits for three months and had to send a letter to her landlord explaining why she was late on rent.

59.     These barriers to protecting and accessing their funds likely have led some cardholders to give up entirely on seeking Regulation E's protections or other assistance.

60.     Direct Express cardholders cannot opt to have another bank administer their Direct Express account. Nor can they choose which vendor Comerica designates to provide them with account services or how those services are provided.

### E. Comerica's Failure to Provide Cardholders with Accurate and Complete Information Regarding Enrollment Fraud

61.     Sometimes consumers contacted Comerica alleging they had been fraudulently enrolled into the Direct Express program because someone improperly created an account in their name. When this occurred, Vendor 1, following procedures approved by Comerica, investigated their claims in the same way it investigated notices of error under Regulation E.

62.     If Vendor 1 determined that enrollment fraud occurred, it sent a template *denial* letter from the Direct Express Fraud Services Department to the consumer, which stated incorrectly that the Bank determined "that the transaction(s) in question were not unauthorized; therefore, no error occurred."

63.     This letter did not accurately inform consumers of the results of Vendor 1's investigation: that enrollment fraud in fact occurred. Nor did it inform consumers that they should contact the government entity paying the benefits at issue to recover any benefits that may have been stolen.

64.     Under Vendor 1's procedures, only cardholders who called Vendor 1's customer service phone line in response to receiving the denial letter were informed about the occurrence of enrollment fraud and received information about how to remedy the problem.

65.    Those consumers who did not call Vendor 1's customer service phone line in response to a denial letter were not informed that Comerica or its Vendor determined there was enrollment fraud or advised how the consumer can recover the lost benefits.

**F. Comerica's Practice of Charging Cardholders ATM Fees They Did Not Owe**

66.    Between April 1, 2019 and April 30, 2024, Comerica, through its Vendors, charged cardholders ATM fees that they did not owe.

67.    At the time of enrollment, Comerica, through its Vendors, provided cardholders with a disclosure itemizing all fees authorized for the Direct Express program.

68.    The disclosure provided that cardholders are entitled to one free ATM withdrawal per month per deposit of funds into their Direct Express accounts and that Comerica, through its Vendors, assesses a fee for each additional withdrawal. The disclosure also confirmed that "There is no ATM denial fee associated with this account."

69.    Comerica, through its Vendors, tracked cardholders' free monthly ATM withdrawal benefit by applying an ATM withdrawal waiver to each Direct Express account every month.

70.    Comerica's Vendors received a benefits payment file for each cardholder before the date the benefits were available to the cardholder for use and withdrawal. When Comerica Vendors received this payment file, they often reset the cardholder's monthly ATM withdrawal waiver.

71.    Because of this sequencing, a gap in time, generally lasting one to five days, existed between the reset of the ATM withdrawal waiver and the cardholder's ability to access their funds for withdrawal ("the interstitial period").

72.     Where a cardholder attempted an ATM withdrawal in the interstitial period and the account had insufficient funds to complete the withdrawal, Comerica, through its Vendors, denied the transaction. Despite denying the transaction for insufficient funds and not disbursing any money, Comerica, through its Vendors, applied the ATM withdrawal waiver to the ATM denial, which should never have incurred any fees.

73.     When a cardholder in this situation later successfully completed the first transaction after the newly deposited funds became available for withdrawal, Comerica, through its Vendors, charged the cardholder an ATM withdrawal fee for the transaction—improperly denying the cardholder the free monthly ATM withdrawal to which they were entitled.

74.     During the relevant period, Comerica, through its Vendors, charged more than 1 million Direct Express cardholders millions of dollars in ATM fees for withdrawals that should have been free.

**G.     Comerica's Failure to Stop Payments**

75.     Under Regulation E, consumers are entitled to stop preauthorized electronic funds transfers by notifying the relevant financial institution at least three business days before the scheduled date of the transfer. 12 C.F.R. § 1005.10(c)(1).

76.     Since April 1, 2019, Comerica, through its Vendors, has failed to honor thousands of Direct Express cardholders' timely stop-payment requests on preauthorized transfers.

77.     When consumers sign up for Direct Express accounts, they receive terms of use (Terms) which govern usage of their Direct Express cards.

78.     Section B.2. of the Terms addresses preauthorized payments and states that Direct Express cardholders have the right to cancel a preauthorized payment (commonly referred to as a "stop-payment request").

15

79.     The Terms sent to new Direct Express cardholders between April 1, 2019 and May 31, 2020, listed two requirements to cancel a preauthorized payment: (1) Direct Express cardholders had to contact customer service at the provided phone number or address at least three business days before the scheduled date of payment, and (2) they also had to notify the merchant.

80.     In May 2020, Comerica, through its Vendors, began sending a change notice to Direct Express cardholders, deleting from the Terms the requirement to notify the merchant from the section on preauthorized payments.

81.     For thousands of Direct Express cardholders whose accounts were serviced by Vendor 1, from April 1, 2019 to July 2, 2020, customer service representatives did not process stop-payment requests unless the cardholder indicated they had already contacted the merchant.

82.     For thousands of Direct Express cardholders whose accounts were serviced by Vendor 2, prior to August 31, 2020, Vendor 2 did not process stop-payment requests even if the consumer had contacted the merchant because Vendor 2 lacked the technical capability to stop preauthorized payments.

83.     Instead, when Direct Express cardholders submitted stop-payment requests to Vendor 2, Vendor 2's customer service representatives advised them the only thing Vendor 2 could do was close the requesting cardholders' accounts and issue a new debit card. The new account would not have the preauthorization for the transfer that was attached to the old account number.

84.     Cardholders who followed Vendor 2's instructions to close an account and request a new card were charged a $4.00 fee for the replacement card. If the consumer requested expedited delivery (2–3 day delivery) in order to avoid losing access to funds during

the standard 7–10 delivery period, the consumer was charged an additional $13.50.

85.    Because Comerica, through its Vendors, offered cardholders one free replacement card per year, if the consumer had not yet received a replacement card in the past year, the $4.00 fee would be waived but the expedited delivery fee still applied.

**H. Comerica's Failure to Timely Investigate Cardholder Claims**

86.    Under Regulation E, financial institutions must promptly investigate and resolve notices of error and limit consumer liability for unauthorized electronic funds transfers (EFTs). 12 C.F.R. § 1005.11(c).

87.    In its Terms, Comerica, through its Vendors, directs Direct Express cardholders to contact customer support as soon as they can in instances where they believe an error has occurred with their account.

88.    Financial institutions are required to complete their investigations within 10 business days of receiving a notice of error. This can be extended to 45 days if the financial institution gives the consumer provisional credit, and it can be extended further to 90 days if the disputed transaction involves an EFT that was not initiated within a state, resulted from a point-of-sale debit card transaction, or happened within 30 days after the first account deposit was made. 12 C.F.R. § 1005.11(c).

89.    Since April 1, 2019, in more than 19,900 instances, Comerica, through its Vendors, has failed to promptly investigate Direct Express cardholders' notices of error concerning alleged unauthorized EFTs because it failed to determine whether an error occurred within 10 business days of receiving the notice of error and could not avail itself of the longer time periods for investigation permitted under Regulation E because it did not provide provisional credit to consumers in these instances.

90.     During the same period, in more than 1,500 instances where Comerica, through its Vendors, did issue provisional credits to consumers, it still failed to complete its investigation of Direct Express cardholders' notices of error concerning alleged unauthorized EFTs within the required timeframes under Regulation E.

### I. Comerica's Failure to Provide Cardholders with a Written Explanation of Its Findings

91.     Under Regulation E, if a financial institution "determines that no error occurred or that an error occurred in a manner or amount different from that described by the consumer," the report of the results of the investigation "shall include a written explanation of the institution's findings and shall note the consumer's right to request the documents that the institution relied on in making its determination." 12 C.F.R. § 1005.11(d)(1).

92.     Since April 1, 2019, Comerica, through its Vendors, has failed to send written explanations to Direct Express cardholders informing them that no error occurred or that an error occurred in a manner or amount that was different from what the cardholders indicated in more than 40 instances.

93.     In another more than 220,000 instances, Comerica, through its Vendors, upon completing investigations of notices of error, sent notices to consumers that were vague and failed to provide an explanation of its findings related to the claim. In some instances, it failed to send a notice at all.

### J. Comerica's Failure to Notify Cardholders that It Would Honor Checks and Drafts for Five Business Days after Debiting Previously Issued Provisional Credit Without Assessing Overdraft Fees.

94.     Regulation E requires financial institutions, when rescinding provisional credit, to inform consumers that it will honor checks, drafts, and preauthorized transfers for five business days after the notification without charging the consumer as a result of an overdraft. 12 C.F.R.

§ 1005.11(d)(2)(ii).

95.     Since May 24, 2021, where Comerica, through its Vendors, provided notices to Direct Express cardholders that provisional credit would be reversed, the transmittal letters did not clearly explain that Comerica would not assess overdraft fees for any preauthorized transfers it honored within the five-day grace period in more than 6,900 instances.

96.     Separately, in more than 360 instances during the time period of November 15, 2020 to January 10, 2021, Comerica, through its Vendors, failed to notify Direct Express cardholders that it was debiting previously issued provisional credit but would honor checks and drafts for five business days without assessing overdraft fees for any preauthorized transfers honored during that period.

### COUNT I
### Violation of the CFPA (Unfairness)

**Comerica unfairly failed to provide consumers a reasonable way to obtain effective and timely assistance, interfering with consumers' ability to avail themselves of Regulation E's protections and to protect and access their funds.**

97.     The Bureau realleges and incorporates by reference Paragraphs 1 through 96.

98.     The CFPA makes it unlawful for any covered person to engage in any unfair act or practice. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. *Id*. § 5531(c).

99.     Comerica's failure to provide Direct Express cardholders with timely and efficient assistance with their accounts has caused or was likely to cause substantial injury to cardholders.

100.    As outlined in paragraphs 35 to 60, the main way Direct Express cardholders

invoke their protections under Regulation E and obtain account services is by calling Comerica's Vendor-managed phone lines and speaking with a customer service representative. Since at least April 1, 2019, through its failure to provide sufficient assistance to Direct Express cardholders, including by dropping and failing to answer consumers' calls, Comerica impeded cardholders' ability to report unauthorized transactions on their accounts, receive liability protection from such transactions, or obtain help with other account problems that prevent them from accessing their essential government benefits.

101.    Direct Express cardholders cannot reasonably avoid these injuries. Comerica will only accept notices of error or requests to stop preauthorized payments through the phone line or mail, and offers very few services through its Direct Express website or app. Further, cardholders are a captive market. They are unable to choose the financial institution that administers the Direct Express program, the Vendor assigned to manage their account, or the manner in which Comerica and its vendors service Direct Express accounts.

102.    These injuries are not outweighed by any countervailing benefits to consumers or competition.

103.    Accordingly, Comerica's actions constituted unfair acts and practices, in violation of the CFPA.

### COUNT II
### Violation of the CFPA (Unfairness)

**Comerica unfairly provided consumers with inaccurate and incomplete information after confirming instances of enrollment fraud.**

104.    The Bureau realleges and incorporates by reference Paragraphs 1 through 96.

105.    The CFPA makes it unlawful for any covered person to engage in any unfair act or practice. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to

cause substantial injury to consumers, which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. *Id*. § 5531(c).

106.    As outlined in paragraphs 61 to 65, from April 1, 2019 through at least September 6, 2024, Comerica, through Vendor 1, provided inaccurate and incomplete information to consumers who contacted Direct Express alleging that they had been fraudulently enrolled into the Direct Express program. Even where Vendor 1 determined that enrollment fraud had occurred, it sent the defrauded consumers incorrect response letters stating that "no error occurred." Comerica, through Vendor 1, also failed to inform the defrauded consumers that they needed to contact the paying government agency to remediate their losses. In doing so, Comerica engaged in an unfair practice.

107.    Vendor 1's incorrect response letters and failure to provide consumers with information about the existence of enrollment fraud and the proper remedy caused or was likely to cause substantial injury to consumers. Consumers could reasonably interpret the denial letter's statement that no error occurred as the final disposition of their disputes and abandon their efforts to remedy the fraud. Thousands of consumers who had already been defrauded continued to lose government benefits, which were being distributed to the fraudulent enrollees, despite Vendor 1's determination that enrollment fraud had, in fact, occurred.

108.    Consumers could not reasonably avoid their injuries because Comerica, through Vendor 1, misled them about the findings of its investigations and withheld the information necessary for consumers to avoid or mitigate their losses.

109.    These injuries are not outweighed by any countervailing benefits to consumers or competition.

110.    Accordingly, Comerica's actions constituted unfair acts and practices, in violation of the CFPA.

<u>**COUNT III**</u><br>**Violation of the CFPA (Unfairness)**

**Comerica unfairly charged cardholders ATM withdrawal fees that they did not owe.**

111.    The Bureau realleges and incorporates by reference Paragraphs 1 through 96.

112.    The CFPA makes it unlawful for any covered person to engage in any unfair act or practice. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. *Id*. § 5531(c).

113.    As outlined in paragraphs 66 to 74, since at least April 1, 2019, Comerica, through its Vendors, has charged Direct Express cardholders ATM withdrawal fees for transactions that should have been free according to the fee schedule sent to the cardholders, and as required by Comerica's contract with BFS. In doing so, Comerica engaged in an unfair practice.

114.    The practice of charging incorrect ATM withdrawal fees caused or was likely to cause substantial injury to Direct Express cardholders: for example, through its Vendors, Comerica has charged more than 1 million Direct Express cardholders millions of dollars in ATM withdrawal fees for transactions that should have been free.

115.    Cardholders could not reasonably avoid their injuries. Cardholders are a captive market and do not get to choose the financial institution that administers the Direct Express program or the Vendor to which Comerica assigns their account for servicing. Nor could cardholders reasonably anticipate that Comerica or its Vendor would incorrectly count failed

ATM withdrawal attempts against their entitlement to one free monthly ATM withdrawal.

116.    These injuries are not outweighed by any countervailing benefits to consumers or competition.

117.    Accordingly, Comerica's actions constituted unfair acts and practices, in violation of the CFPA.

**COUNT IV**
**Violation of the EFTA**

**Comerica required Direct Express cardholders to waive a right
conferred by the EFTA.**

118.    The Bureau realleges and incorporates by reference Paragraphs 1 through 96.

119.    Under the EFTA, no writing or agreement between a consumer and any other person, which includes a financial institution, may contain any provision which constitutes a waiver of any right conferred by the statute. 15 U.S.C. § 1693*l*.

120.    One such right is consumers' ability to stop a preauthorized transfer from the consumer's account by notifying the financial institution orally or in writing at least three business days before the scheduled date of the transfer. 15 U.S.C. § 1693e(a); 12 C.F.R. § 1005.10(c)(1).

121.    As outlined in paragraphs 75 to 85, from April 1, 2019 to December 1, 2020, Comerica, through its Vendors, included a provision in its Terms requiring Direct Express cardholders who were seeking to stop a preauthorized transfer to not only notify the Bank at least three business days before the date of transfer, but also to contact the merchant. Indeed, prior to July 2020, customer service representatives did not honor stop-payment requests unless the cardholder had already contacted the merchant.

122.    Comerica's requirement in its Terms that Direct Express cardholders contact the

merchant in order to stop a preauthorized transfer constitutes a waiver of the right to do so solely by contacting the financial institution, in violation of the EFTA.

## COUNT V
### Violation of Regulation E

**Comerica failed to honor timely submitted stop-payment requests
for preauthorized transfers.**

123.    The Bureau realleges and incorporates by reference Paragraphs 1 through 96.

124.    Under Regulation E, a consumer may stop payment of a preauthorized transfer from the consumer's account by notifying the financial institution at least three business days before the scheduled date of the transfer. 12 C.F.R § 1005.10(c)(1).

125.    As outlined in paragraphs 75 to 85, prior to August 31, 2020, Comerica, through its Vendors, did not stop timely submitted stop-payment requests on preauthorized transfers for Direct Express cardholders whose accounts were serviced by Vendor 2.

126.    Additionally, prior to July 2020, in certain instances Vendor 1's representatives did not process timely submitted requests to stop payment on preauthorized transfers because the Direct Express cardholders had not contacted the merchant.

127.    Accordingly, Comerica failed to honor timely submitted stop-payment requests, in violation of Regulation E.

## COUNT VI
### Violation of Regulation E

**Comerica failed to timely investigate notices of error.**

128.    The Bureau realleges and incorporates by reference Paragraphs 1 through 96.

129.    Under Regulation E, financial institutions are required to promptly investigate notices of error and determine whether an error occurred within 10 business days. 12 C.F.R. § 1005.11(c)(1). If a financial institution cannot complete its investigation within 10 business

24

days, it may take up to 45 days to determine whether an error occurred, provided the financial

institution provisionally credits the consumer's account in the amount of the alleged error. *Id.*

§ 1005.11(c)(2). For point-of-sale debit card transactions, such as those conducted with the

Direct Express card, financial institutions may take up to 90 days to complete their

investigation, if needed, provided they provisionally credit the consumer's account while

completing the investigation. *Id.* § 1005.11(c)(3)(ii).

130.    As outlined in paragraphs 86 to 90, since April 1, 2019, Comerica, through its

Vendors, did not complete more than 19,900 investigations of Direct Express cardholders'

notices of error within 10 business days for which they did not timely provide provisional

credit.

131.    Additionally, since April 1, 2019, Comerica, through its Vendors, provided

provisional credit but did not complete more than 1,500 investigations of Direct Express

cardholders' notices of error within 90 calendar days.

132.    Accordingly, Comerica failed to timely investigate Direct Express cardholders'

notices of error, in violation of Regulation E.

<u>**COUNT VII**</u>
**Violation of Regulation E**

**Comerica failed to provide a written explanation of its findings after determining
that no error or a different error occurred.**

133.    The Bureau realleges and incorporates by reference Paragraphs 1 through 96.

134.    Under Regulation E, where a financial institution completes an investigation

following a notice of error and determines that no error occurred or a different error occurred

from that described by the consumer, it must provide additional information to the consumer. 12

C.F.R. § 1005.11(d). In particular, the financial institution must provide a written explanation of

25

its findings and shall note the consumer's right to request the documents that the institution

relied on in making its determination. *Id*. § 1005.11(d)(1).

135.    As outlined in paragraphs 91 to 93, in more than 140 instances, Comerica, through

its Vendors, concluded an investigation and determined that no error occurred but failed to send the

required written explanation to Direct Express cardholders.

136.    Additionally, in more than 220,000 instances, Comerica, through its Vendors, sent

Direct Express cardholders notices that failed to state that the claim had been denied and did not

include sufficient explanation of its findings related to the claim.

137.    Accordingly, Comerica failed to provide Direct Express cardholders with a written

explanation of the findings of its investigation, in violation of Regulation E.

<u>**COUNT VIII**</u>
**Violation of Regulation E**

**Comerica failed to notify consumers that it will honor checks, drafts, and preauthorized
transfers for five business days after debiting previously issued provisional credit without
charging overdraft fees.**

138.    The Bureau realleges and incorporates by reference Paragraphs 1 through 96.

139.    Under Regulation E, where a financial institution completes an investigation

following a notice of error and determines that no error occurred or a different error occurred

from that described by the consumer, it must follow certain procedures. 12 C.F.R. § 1005.11(d).

In particular, if the financial institution is debiting a provisionally credited amount, the financial

institution must notify the consumer that the institution will honor checks, drafts, or similar

instruments payable to third parties and preauthorized transfers from the consumer's account for

five business days after the notification ("five-day grace period"). *Id*. § 1005.11(d)(2)(ii). The

financial institution must expressly notify the consumer that such charges will not result in an

overdraft fee. *Id*.

140.     As outlined in paragraphs 94 to 96, when Comerica, through its Vendors, determined that no error occurred and were debiting a provisionally credited amount, in more than 360 instances, they failed to notify Direct Express cardholders that Comerica would honor checks, drafts, or similar instruments payable to third parties and preauthorized transfers from the consumer's account for the five-day grace period, and would not assess overdraft charges for any preauthorized transfers it honored within the five-day grace period. Separately, in more than 6,900 instances, Comerica, through its Vendors, sent cardholders notices that failed to explain that Comerica would not assess overdraft charges for any preauthorized transfers it honored within the five-day grace period.

141.     Accordingly, Comerica failed to notify Direct Express cardholders that all checks, drafts, and preauthorized transfers it honored during the five-day grace period would not result in overdraft charges, in violation of Regulation E.

## PRAYER FOR RELIEF

142.     WHEREFORE, the Bureau requests that this Court:

    a. Permanently enjoin Comerica from committing future violations of the CFPA, the EFTA, and Regulation E;

    b. award such relief as the Court finds necessary to redress injury to consumers resulting from Comerica's violations, including but not limited to the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages;

    c. impose a civil money penalty against Comerica;

    d. awards the Bureau its costs in bringing this action; and

    e. award additional relief as the Court may determine to be just and proper.

Dated: March 13, 2025

Respectfully submitted,

CARA PETERSEN
Acting Enforcement Director

RICHA SHYAM DASGUPTA
Deputy Enforcement Director

TIMOTHY M. BELSAN
Assistant Deputy Enforcement Director

 /s/ J. Khalid Hargrove
J. KHALID HARGROVE
Email: jimmy.hargrove@cfpb.gov
Phone: 202-595-4944
ALEX J. GRANT
Email: alex.grant@cfpb.gov
Phone: (212) 328-7040
JONATHAN HATCH*
Email: jonathan.hatch@cfpb.gov
Phone: (202) 341-3316
JACK DOUGLAS WILSON*
Email: doug.wilson@cfpb.gov
Phone: (202) 309-8084

Consumer Financial Protection Bureau
1700 G Street, N.W.
Washington, D.C. 20552

**ATTORNEYS FOR THE CONSUMER
FINANCIAL PROTECTION BUREAU**

*\*Pro hac vice* forthcoming