# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | Case No. 3:24-cv-3054-B |
| Plaintiff, | Judge Jane J. Boyle |
| *v.* | |
| COMERICA BANK, | |
| Defendant. | |

## DEFENDANT COMERICA BANK'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS
## <u>MOTION TO DISMISS AMENDED COMPLAINT</u>

MATTHEW P. PREVIN
(admitted *pro hac vice*)
matthewprevin@paulhastings.com
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: (202) 318-6049

JONICE M. GRAY
(admitted *pro hac vice*)
jonicegray@paulhastings.com
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1781

PAUL R. GENENDER
Texas Bar No. 00790758
paulgenender@paulhastings.com
PAUL HASTINGS LLP
2001 Ross Avenue, Suite #2700
Dallas, Texas 75201
Telephone: (972) 936-7500

***Counsel for Defendant Comerica Bank***

## TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 2

BACKGROUND ........................................................................................................... 5

LEGAL STANDARD .................................................................................................... 6

ARGUMENT ................................................................................................................. 7

I.    The CFPB's Current Funding Mechanism Is Unconstitutional and Not in Accordance with the Law ........................................................................................................ 7

II.   Count I Should Be Dismissed Because the CFPB's UDAAP Authority Does Not Extend to Oversight of Customer Service Call Wait Times ........................................ 10

III.  Count II Should Be Dismissed Because the CFPB's Assertion of Its UDAAP Authority Is Inconsistent with EFTA ................................................................................ 12

IV.   Counts I and II Retroactively Apply New Statutory Interpretation to Past Conduct in Violation of Due Process ................................................................................ 14

V.    The Amended Complaint Fails To Allege Plausibly Any Violation of the CFPA, EFTA, or Regulation E ........................................................................................................ 16

A.   The CFPB Fails To Allege Plausibly that Customer Service Call Wait Times Experienced by Some Direct Express Cardholders Were Unfair (Count I) ........ 17

B.   The CFPB Fails To Allege Plausibly that Comerica's Handling of Alleged Enrollment Fraud Was Unfair (Count II) ........................................................... 18

C.   The CFPB Fails To Allege Plausibly that Comerica's Assessment of ATM Withdrawal Fees Was Unfair (Count III) ........................................................... 19

D.   The CFPB Fails To Allege Plausibly that Comerica Required Cardholders to Waive a Right Conferred by EFTA (Count IV) .................................................... 19

E.   The CFPB Fails To Allege Plausibly that Comerica Failed To Honor Stop Payment Requests of Preauthorized Transfers (Count V) ................................. 21

F.   The Remaining Regulation E Claims Are Supported by Nothing More than Recitations of the Regulation and Naked Assertions (Counts VI, VII, and VIII) 22

VI.   The CFPB's Claims Are Untimely, at Least in Part ....................................................... 23

A.   Counts I, II, and III Are Untimely in Part Under the CFPA's Three-Year Statute of Limitations ................................................................................................ 23

B.    Counts IV-VIII Are Untimely in Whole or in Part Under EFTA's One-Year
       Statute of Limitations ........................................................................................... 24

CONCLUSION ............................................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................................6, 23

*BCFP v. Fifth Third Bank, N.A.*,
  No. 1:21-cv-262, 2023 U.S. Dist. LEXIS 202055 (S.D. Ohio Sep. 26, 2023) ...................4, 25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................................4, 6, 16, 23

*CFPB v. Active Network, LLC*,
  No 4:22-cv-00898-ALM (E.D. Tex. Oct. 7, 2024), ECF No. 51...........................................10

*CFPB v. Citizens Bank, N.A.*,
  504 F. Supp. 3d 39 (D. R.I. 2020)...........................................................................25

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024)........................................................................................3, 7, 9

*CFPB v. Intercept Corp.*,
  No. 3:16-cv-144, 2017 U.S. Dist. LEXIS 143789 ...................................................17

*CFPB v. ITT Educ. Servs., Inc.*,
  219 F. Supp. 3d 878 (S.D. Ind. 2015).....................................................................25

*CFPB v. NDG Fin. Corp.*,
  No. 15-cv-5211, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016)...............................................23

*CFPB v. Ocwen Fin. Corp.*,
  No. 17-80495-civ, 2019 U.S. Dist. LEXIS 152336 (S.D. Fla. Sept. 5, 2019).......................25

*CFPB v. PayPal, Inc.*,
  No. 1:15-cv-01426-RDB, ECF No. 1, ¶ 70-75 (May 19, 2015) ...........................................16

*CFPB v. Snap Fin. LLC*,
  No. 2:23-cv-00462-JNP-JCB, 2024 U.S. Dist. LEXIS 136828 (D. Utah Aug.
  1, 2024) ........................................................................................................25

*CFPB v. SoLo Funds, Inc.*,
  2:24-cv-04108-RGK-AJR, 2024 U.S. Dist. LEXIS 189410 (C.D. Cal. Oct. 17,
  2024) ..........................................................................................................10

*CFPB v. Walmart Inv.*,
No. 24-cv-4610, 2024 CFPB Admin. Proc. LEXIS 94 (D. Minn. Dec. 23,
2024) ...........................................................................................................................21

*Chamber of Comm. of the U.S. v. CFPB*,
691 F. Supp. 3d 730 (E.D. Tex. 2023) ..............................................................11, 12

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012)............................................................................................4, 14, 15

*Clark v. Martinez*,
543 U.S. 371 (2005).........................................................................................................10

*Colonial Penn. Ins. Co. v. Market Planners Ins. Agency, Inc.*,
1 F.3d 374 (5th Cir. 1003) ........................................................................................23, 24

*Davis v. HSBC Bank Nev., N.A.*,
691 F. 3d 1152 (9th Cir. 2012) ...................................................................................18

*Director, Office of Workers' Comp. Programs, Dep't of Labor v. Newport News
Shipbuilding & Dry Dock Co.*,
514 U.S. 122 (1995)........................................................................................................12

*F.C.C. v. Fox TV Stations, Inc.*,
567 U.S. 239 (2012)........................................................................................................14

*Frame v. City of Arlington*,
657 F.3d 215 (5th Cir. 2011) .......................................................................................23

*FTC v. RCG Advances, LLC*,
695 F. Supp. 3d 368 (S.D.N.Y. 2023)........................................................................18

*Haymore v. Amazon.com, Inc.*,
No. 2:24-cv-729 TLN-SCR, 2024 U.S. Dist. LEXIS 210177 (E.D. Cal. Nov.
19, 2024) .........................................................................................................................12

*High Desert Relief, Inc. v. United States*,
917 F.3d 1170 (10th Cir. 2019) .....................................................................................8

*Money v. City of San Marcos*,
No. 24-50187, 2025 WL 429980 (5th Cir. Feb. 7, 2025) .......................................21

*Off. of Pers. Mgmt. v. Richmond*,
496 U.S. 414 (1990)..........................................................................................................9

*PHH Corp. v. CFPB*, 839 F.3d 1 (D.C. Cir. 2016),
*reinstated in relevant part on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018),
*abrogated on other grounds*, *Seila L. LLC v. CFPB*, 591 U.S. 197 (2020)............................15

iv

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
    566 U.S. 639 (2012)..................................................................................................4, 13

*Reeside v. Walker,*
    52 U.S. 272 (1850)...........................................................................................................9

*Seila L. LLC v. CFPB,*
    591 U.S. 197 (2020).......................................................................................................10

*Smith v. BP Expl. & Prod.,*
    No. 23-30552, 2024 U.S. App. LEXIS 9528 (5th Cir. 2024) .................................23

*Texas v. Colony Ridge, Inc.,*
    No. H- 24-0941 (S.D. Tex. Oct. 11, 2024), ECF No. 61 ......................................10

*Utility Air Regulatory Group v. EPA,*
    573 U.S. 302 (2014)..........................................................................................................4

*Varity Corp.* v. *Howe,*
    516 U.S. 489 (1996) (Thomas, J., dissenting) .............................................................4

*In the Matter of Wells Fargo Bank, N.A.,*
    2016-CFPB-0015 ............................................................................................................16

*West Virginia v. EPA,*
    597 U.S. 697 (2022)..........................................................................................4, 11, 12

**Statutes**

12 U.S.C. § 5481(12)(C)...................................................................................................25

12 U.S.C. § 5497........................................................................................................3, 7, 9, 10

12 U.S.C. § 5531....................................................................................................11, 13, 17, 19

12 U.S.C. § 5564(g)...................................................................................................23, 24

15 U.S.C. § 45(a) .................................................................................................................14

15 U.S.C. § 1607................................................................................................................25

15 U.S.C. § 1640................................................................................................................25

15 U.S.C. § 1681s(d)..........................................................................................................25

15 U.S.C. § 1692l(b)(6) .....................................................................................................25

15 U.S.C. § 1693 ....................................................................................................... *passim*

15 U.S.C. § 1693(a) ........................................................................................14

15 U.S.C. § 1693(l) .........................................................................................19

*Wheeler-Lea Act*, ch. 49, § 3, 52 Stat. 111 (1938) .........................................14

**Constitutional Provisions**

U.S. Const. amend. V ................................................................................14, 16

U.S. Const. art. I, § 9, cl. 7 ..............................................................................7

**Rules**

Fed. R. Civ. Proc. 12(b)(6) ..................................................................2, 21, 23

Local Rules 7.1 and 7.2.....................................................................................2

**Regulations**

12 C.F.R. § 1005.6 ...........................................................................................13

12 C.F.R. § 1005.10 ...................................................................................20, 22

12 C.F.R. § 1005.11 .........................................................................................13

12 C.F.R. § 1005.15 .........................................................................................13

**Other Authorities**

CFPB, *CreditRepair.com and Lexington Law refund checks: What you need to know* (Dec. 5, 2024), available at https://www.consumerfinance.gov/about-us/blog/creditrepaircom-and-lexington-law-refund-checks-what-you-need-to-know/...............................................................................................................15

CFPB, Statement on Abusive Acts or Practices (April 3, 2023), *available at* https://www.consumerfinance.gov/compliance/supervisory-guidance/policy-statement-on-abusiveness/ ...............................................................................15

CFPB, *Supervisory Highlights*, Issue 22, Summer 2020 ................................21

Nasdaq, *Glossary of Stock Market Terms*, EBITDA, https://tinyurl.com/4e8wtpmx (last visited Dec. 16, 2024) (May 31, 2024)............................8

Press Release, Fed. Rsrv., *Fed Rsrv. Bd. Announces Rsrv. Bank Income and Expense Data and Transfers to the Treasury for 2022* (last updated Jan. 13, 2023), https://tinyurl.com/ymrzcsfp...................................................................8

Press Release, Fed. Rsrv., *Fed. Rsrv. Bd. Releases Ann. Audited Fin. Statements*
(last updated Mar. 24, 2023), https://tinyurl.com/2xnjtywc ....................................................8

Press Release, Fed. Rsrv., *Fed. Rsrv. Bd. Releases Ann. Audited Fin. Statements*
(last updated Mar. 26, 2024), https://tinyurl.com/5xayzb38....................................................8

Social Security Administration, *Paying Monthly Benefits*, available at
https://www.ssa.gov/kc/rp_paybenefits.htm (last visited Mar. 17, 2025) ...............................5

The Amended Complaint should be dismissed for the same reasons as the original Complaint. In fact, it is nothing more than a thinly veiled, improper ploy by the Consumer Financial Protection Bureau ("CFPB") to delay resolution of this lawsuit.  On February 21, 2025, Comerica Bank ("Comerica" or the "Bank") moved to dismiss the CFPB's Complaint in its entirety.  Rather than file an opposition brief by the March 21 deadline previously set by this Court (ECF No. 25), the CFPB filed a motion on March 3 to stay the briefing schedule to allow the CFPB to "review the matter."  ECF No. 28.  Comerica opposed the CFPB's motion to stay, citing the reputational harm the lawsuit is causing the Bank.  This Court agreed with Comerica and denied the CFPB's motion to stay, holding that the CFPB had "failed to explain how staying the case would be in the interest of justice" and that there "is a fair possibility that staying the case would harm Defendant Comerica Bank."  ECF No. 30 at 1-2.

Rather than comply with the Court's order and file its opposition to Comerica's motion to dismiss by the March 21 deadline, the CFPB tries an end-run around this Court's order by filing an Amended Complaint nearly identical to the original Complaint on matters that would impact resolution of Comerica's original motion to dismiss.  The Amended Complaint adds no new causes of action.  The small number of changes to the factual allegations (a few deleted, and a few added) are immaterial to the viability of the legal arguments Comerica previously advanced in moving to dismiss the original Complaint.  The only material change in the Amended Complaint is the withdrawal of five, fatally flawed claims that had been pleaded in the original Complaint.  It was not necessary for the CFPB to file an amended complaint to withdraw these five claims.  Instead, the CFPB could have filed its opposition to Comerica's motion to dismiss the original Complaint while noting in its opposition that it was withdrawing these five claims.   Through this improper

tactic and procedural gamesmanship, the CFPB is trying effectively to obtain the stay that this Court previously denied. Comerica is swiftly moving to dismiss the Amended Complaint in hopes of minimizing the prejudice caused by this pending case.

Regrettably, Comerica is forced to expend resources to seek again to dismiss the CFPB's pending lawsuit, and suffer the prejudicial delay caused by this Amended Complaint. Pursuant to Federal Rules of Civil Procedure 12(b)(6) and Local Rules 7.1 and 7.2, Comerica hereby respectfully moves the Court to dismiss the Amended Complaint (ECF No. 31) for the following six reasons: (i) the CFPB's current funding method violates both the Appropriations Clause and the Dodd-Frank Act, and the CFPB, therefore, has no legal authority to initiate this enforcement action; (ii) the Consumer Financial Protection Act's ("CFPA") prohibition on unfair, deceptive, or abusive acts or practices ("UDAAP") does not encompass the length of customer service call wait times; (iii) the CFPB's attempted use of its UDAAP enforcement authority seeks to circumvent impermissibly the legal framework of the Electronic Funds Transfer Act ("EFTA"); (iv) certain of the CFPB's CFPA claims violate Comerica's constitutional due process rights; (v) the CFPB's claims fail to plausibly allege violations of the CFPA, the EFTA, or Regulation E; and (vi) the CFPB's claims are time-barred, at least in part.

## INTRODUCTION

The Amended Complaint drastically oversteps the bounds of the CFPB's constitutional and statutory authority while asserting a litany of claims that fail to adduce the requisite minimum factual allegations or support. This Court should reject the CFPB's attempt to extend its authority beyond the permissible scope of its authority, and dismiss the Amended Complaint in its entirety.

In 2008, Comerica was selected by the U.S. Department of Treasury's Bureau of the Fiscal Service ("BFS") to administer the Direct Express program. The Direct Express program enables recipients of federal financial benefits to open prepaid debit card accounts to receive and use

benefit disbursements electronically. As the administrator of Direct Express, Comerica has successfully facilitated the distribution of billions of dollars in federal benefits to millions of Americans.

With the benefit years of oversight and knowledge of Comerica's operations, the BFS retained and then repeatedly renewed the Bank as administrator of the Direct Express program for 17 years. With the Amended Complaint, the Bureau seeks to substitute the BFS's oversight and judgment with its own. The Court should reject the CFPB's Amended Complaint for the following six reasons:

*First*, the CFPB lacks authority to bring this enforcement action because the CFPB's funding mechanism currently violates both the Appropriations Clause and the CFPB's funding statute, the Dodd-Frank Act. The CFPB's "funding is . . . subject to the requirements of the Appropriations Clause," which requires "'Appropriation[s] made by Law.'" *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) (citation omitted). The Dodd-Frank Act authorizes the CFPB to draw funds from a specific source—"the combined *earnings* of the Federal Reserve System." 12 U.S.C. § 5497(a)(1) (emphasis added). But there are currently *no* earnings of the Federal Reserve upon which to draw because the Federal Reserve has not made a profit since 2022. Instead, the CFPB draws from the Federal Reserve's deficit, which is not authorized by the plain language of the governing law and is unlawful under the Appropriations Clause.

*Second*, the CFPB's allegation that Comerica violated the CFPA's prohibition on UDAAPs by subjecting consumers to excessively long call wait times and related dropped calls is foreclosed by the CFPA. Congress in the CFPA did not vest the CFPB with discretion to declare any practice a UDAAP, and the CFPB's attempt to characterize call wait times (and other customer service practices) as a "substantial injury" for the purposes of a putative unfairness claim under the CFPA (Count I) is not a reasonable (or permissible) interpretation of the statute. Support for such an

expansive view of the CFPB's UDAAP enforcement authority must be set by "clear congressional authorization," *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (citing *Utility Air Regulatory Group v. EPA,* 573 U.S. 302, 324 (2014)),  and the CFPB has pointed to none.

*Third*, the CFPB's allegation that Comerica violated the CFPA in connection with the Bank's handling enrollment fraud (Count II) similarly fails. Fraud, account enrollment, and government benefits in the context of electronic fund transfer systems are governed by EFTA. *See, e.g.*, 15 U.S.C. §§ 1693e, 1693f. It is well settled that the obligations of a specific statute generally control over a more general statute, and "[t]hat is particularly true where . . . Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996) (Thomas, J., dissenting)). The CFPB cannot assert its UDAAP enforcement authority where Congress established EFTA as a comprehensive governing legal framework of electronic fund transfer systems.

*Fourth*, even if the CFPA's UDAAP prohibition could be interpreted to cover the conduct at issue in Counts I and II, such interpretations would represent a sudden departure from the historic understanding of the CFPA. The application of such novel interpretations violates Comerica's due process rights, which requires agencies to "provide regulated parties fair warning of the conduct [a regulation] prohibits or requires." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (internal quotation marks and citation omitted) (alteration in original).

*Fifth*, the Amended Complaint fails to supply sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Each Count, therefore, must be dismissed.

*Sixth*, the CFPB's claims are time-barred in whole or in part.

## BACKGROUND

Through the Direct Express program, recipients of federal financial benefits (*e.g.*, social security payments) can open a prepaid debit card account to receive and use benefit disbursements electronically. Amended Complaint ("AC") ¶ 2. Comerica, a Texas banking association headquartered in Dallas, has administered the Direct Express program on behalf of the BFS since 2008. *Id.* ¶¶ 3, 14. In that time, Comerica has facilitated the distribution of billions of dollars in federal benefits to millions of Americans. *Id.* ¶ 21.

Comerica's administration of Direct Express is governed by an exclusive contract between the Bank and BFS. *Id.* ¶ 20. Comerica utilizes two third-party vendors to assist the Bank with the administration of Direct Express, including card issuance, cardholder servicing, and dispute handling. *Id.* ¶¶ 30-31.

The specific features of federal benefit disbursement create unique challenges for Comerica and its third-party vendors. The disbursement period for federal benefits is concentrated into a short window each month. Complaint (ECF No. 1) ¶ 29.[1] This means that money is deposited into the accounts of millions of consumers at the same time every month. This concentration of deposits leads to a spike in the volume of calls to Direct Express customer service phone lines. *Id.*

Comerica and its third-party vendors implement a variety of strategies for handling these surges in customer service calls in a manner consistent with Comerica's commitments to BFS. For example, one of Comerica's vendors uses a dynamic tool during periods of excessive customer service call volume. AC ¶ 40. The tool, known as "Heavy Queue," responds to certain categories of calls by directing that caller via an automated message to visit the vendor's website or mobile

---

[1] For example, Supplemental Security Income benefits are paid on the first of the month, unless the first of the month falls on the weekend in which case payments are issued the Friday before the first of the month. *See* Social Security Administration, *Paying Monthly Benefits*, available at https://www.ssa.gov/kc/rp_paybenefits.htm (last visited Mar. 17, 2025).

application, or call back at a later time. *Id.* ¶ 43-44. Cardholders receive the Heavy Queue message only after indicating, via automated options, that the purpose of the call is of a lower-priority type, such as a balance inquiry. *Id.* Heavy Queue is not used for comparatively urgent calls, including those governed by regulatory requirements (*e.g.*, filing a dispute or reporting a lost or stolen debit card). *Id.* ¶ 43.

Under the contract between the BFS and Comerica, BFS extensively monitors the Bank's customer service performance and compliance with regulatory requirements. With the benefit of this oversight and knowledge of Comerica's operations, BFS has chosen to retain Comerica as administrator of the Direct Express program for over 17 years. *Id.* ¶ 3.

Second-guessing BFS' oversight, the CFPB seeks to improperly substitute its own. In 2021, the CFPB commenced an investigation of Comerica's administration of Direct Express. On November 8, 2024, Comerica filed a complaint against the CFPB seeking relief from the CFPB's unlawful investigation. On December 6, 2024, the CFPB began this enforcement action by filing its initial Complaint against Comerica alleging violations of the CFPA, EFTA, and Regulation E. Comerica filed a Motion to Dismiss the initial Complaint on February 21, 2025. The CFPB then filed a motion to stay the case on March 3, 2025. The Court denied the motion a week later. Three days after the Court's denial, the CFPB filed the Amended Complaint.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[L]abels and conclusions" and "naked assertion[s]" devoid of "further factual enhancement" are not enough. *Twombly*, 550 U.S. at 555, 557. Likewise, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

**I.      The CFPB's Current Funding Mechanism Is Unconstitutional and Not in Accordance with the Law**

The Court should dismiss this entire lawsuit because the Amended Complaint suffers from a critical, foundational defect: the CFPB's current funding mechanism is invalid. Even if the CFPB could state plausible claims for relief, the Bureau may not pursue those claims using funds requisitioned in violation of the Appropriations Clause and the CFPB's enabling statute, the Dodd-Frank Act.

The Supreme Court has confirmed that the CFPB's "funding is . . . subject to the requirements of the Appropriations Clause." *Cmty. Fin. Servs.*, 601 U.S at 425. The Appropriations Clause requires that executive agencies be funded by "[a]ppropriation[s] made by Law." *Id.* (quoting U.S. Const. art. I, § 9, cl. 7). Here, that law is the Dodd-Frank Act, which, as the Supreme Court explained, "authorizes the [CFPB] to draw public funds from a particular source—'the combined *earnings* of the Federal Reserve System.'" *Id.* at 435 (quoting 12 U.S.C. §§ 5497(a)(1), (2)(A)–(B)) (emphasis added). Those "combined earnings" are "surplus funds in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury." *Id.* at 425 (citation omitted). In other words, the earnings that must fund the CFPB (if at all) are the Federal Reserve's revenues *in excess of its expenditures*.

"Earnings" is defined regularly as net income or profit in dictionaries and under generally accepted accounting principles. *See Earnings*, Oxford Dictionary of Accounting (45th ed. 2016) (defining "earnings" as "[t]he net income or profit of a business"); *5.8 Retained Earnings, Fin. Statement Acct. Guide*, PricewaterhouseCoopers, https://tinyurl.com/4er6t478 ("Retained *earnings* represents the earned capital of the reporting entity. . . that develops and builds up over time from *profitable operations*. It consists of all undistributed *income* that remains invested . . . .") (emphasis added). Likewise, when determining earnings before interest, taxes, depreciation, and

amortization (the "EBITDA" metric in accounting and financial modeling), "earnings" necessarily refers to profit. *See, e.g.*, Nasdaq, *Glossary of Stock Market Terms*, EBITDA, https://tinyurl.com/4e8wtpmx (last visited Dec. 16, 2024) (May 31, 2024) (defining "earnings" as the "operating and nonoperating profit before the deduction of interest and income taxes").

The CFPB's current funding, therefore, is not drawn from its authorized source—the Federal Reserve's earnings—because there are *no* earnings of the Federal Reserve System upon which to draw. The Federal Reserve has not made a profit since 2022 because of the rise in interest rates, and has been operating at a loss since then. *See* Press Release, Fed. Rsrv., *Fed. Rsrv. Bd. Releases Ann. Audited Fin. Statements* (last updated Mar. 26, 2024), https://tinyurl.com/5xayzb38 (indicating that the Federal Reserve System's 2023 deficit was $114.3 billion); Press Release, Fed. Rsrv., *Fed. Rsrv. Bd. Releases Ann. Audited Fin. Statements* (last updated Mar. 24, 2023), https://tinyurl.com/2xnjtywc ("CFPB 2022 Fin. Statements Press Release") ("During 2022, the Reserve Banks . . . first suspended weekly remittances to the Treasury and began accumulating a deferred asset, which totaled $16.6 billion by the end of the year.").[2] Thus, the Federal Reserve's expenses have exceeded its revenue, and no funds exist that would otherwise be destined for deposit into the Treasury's general fund. Instead, the CFPB has drawn funding from the Federal Reserve's *deficit* account. *See* Press Release, Fed. Rsrv., *Fed Rsrv. Bd. Announces Rsrv. Bank Income and Expense Data and Transfers to the Treasury for 2022* (last updated Jan. 13, 2023), https://tinyurl.com/ymrzcsfp ("the Reserve Banks were assessed . . . $0.7 billion to fund the operations of the [CFPB]"); CFPB 2022 Fin. Statements Press Release ("audited financial statements of the Reserve Banks" include "assessments of $2.8 billion for Board expenses,

---

[2] It is well established that courts may "take judicial notice of official government publications." *High Desert Relief, Inc. v. United States*, 917 F.3d 1170, 1175 n.1 (10th Cir. 2019) (citation omitted).

currency costs, and the operations of the [CFPB]").

Payments "in direct contravention of the federal statute" violate the Appropriations Clause. *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990). No extra-statutory funding is permitted where "Congress has appropriated no money for the payment[s]," because "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Id.* at 424-25; *see also Reeside v. Walker*, 52 U.S. 272, 291 (1850) (refusing to order payment of a claim against the United States in view of "the want of any appropriation by Congress to pay th[at] claim").[3]

Here, no statute authorizes the Federal Reserve to incur debt to ensure that the CFPB continues to operate. Nor could a statute do so, because the Appropriations Clause does not permit Congress to fund an executive agency not from the general Treasury fund (or revenue that would go into that fund) but on another agency's credit card. The CFPB's unique, statutorily authorized funding mechanism, designed to avoid the need for annual appropriations, is only constitutional insofar as it permits the CFPB to draw funds from money the Federal Reserve would have otherwise deposited into the Treasury—the Federal Reserve's "earnings." *Cmty. Fin. Servs.*, 601 U.S. at 425. When that statutorily designated source remains dry, the CFPB's funding has not been "sanctioned" by Congress, *Reeside*, 52 U.S. at 291, and is therefore unconstitutional.

The Dodd-Frank Act expressly contemplates that where the "sums available to the [CFPB]" from the Federal Reserve are "not . . . sufficient to carry out [its] authorities," the CFPB may seek appropriations directly from Congress. 12 U.S.C. §5497(e)(1).[4] The CFPB could,

---

[3] This requirement applies not only to "'all the taxes raised from the people,'" but also to "'revenues arising from other sources.'" *Richmond*, 496 U.S. at 427 (citation omitted). Accordingly, "not a dollar of" public money "can be used in the payment of anything not thus previously sanctioned" by Congress, because "[a]ny other course would give to the fiscal officers a most dangerous discretion." *Reeside*, 52 U.S. at 291.

[4] The CFPB may argue that this reading of the statute would require it to "predict" future shortfalls, but that is precisely how agency funding appropriations typically work; an agency reports to Congress indicating how much money it

therefore, have requisitioned Congress for additional funding notwithstanding the absence of Federal Reserve earnings. Yet, the CFPB has never done so.

Absent a change in law or another authorization request, Congress has appropriated no other money for funding the CFPB; it expressly designated in the Dodd-Frank Act that the CFPB will be funded only from the Federal Reserve's *earnings*. By funding the CFPB from the Federal Reserve's *debt*, the CFPB is violating its own enabling statute.[5] As such, any action that the CFPB takes using such unappropriated funds—such as prosecuting this lawsuit—is unlawful. In these circumstances, where the CFPB's funding is both unconstitutional and unauthorized by Congress, the "appropriate disposition would be to reverse . . . and dismiss the case." *Seila L. LLC v. CFPB*, 591 U.S. 197, 233 (2020).[6]

## II.    Count I Should Be Dismissed Because the CFPB's UDAAP Authority Does Not Extend to Oversight of Customer Service Call Wait Times

Through Count I, the CFPB alleges that Comerica violated the CFPA's UDAAP prohibition by unfairly failing to provide consumers with sufficient customer service. AC ¶¶ 97-103. The CFPB's allegation is based on call wait times and dropped calls that purportedly prevented consumers from accessing their funds and invoking available protections. *Id.* ¶ 100. The CFPB

---

needs and then Congress appropriates some or all of the requested amount. Just because the CFPB's typical funding mechanism is through the Federal Reserve's surplus does not mean that the CFPB is excused from standard norms and practices, and it has statutory authority to seek additional direct appropriations.

[5] Under the canon of constitutional avoidance, which "allows courts to avoid the decision of constitutional questions," *Clark v. Martinez*, 543 U.S. 371, 381 (2005) (emphasis omitted), the Court here may decide this issue on statutory grounds by ruling that the CFPB's current funding scheme violates the congressional mandate that it is to be funded only from the Federal Reserve's "earnings." 12 U.S.C. § 5497(a)(1).

[6] The CFPB may seek to rely on three recent decisions that rejected challenges to the CFPB's funding, but these decisions are not informative. *CFPB v. Active Network, LLC*, No 4:22-cv-00898-ALM (E.D. Tex. Oct. 7, 2024), ECF No. 51 at 3, provided no reasons for denying a request to dismiss. In *Texas v. Colony Ridge, Inc.*, No. H- 24-0941 (S.D. Tex. Oct. 11, 2024), ECF No. 61 at 9, *memorandum and recommendation adopted* (S.D. Tex. Nov. 26, 2024)— a State of Texas CFPA enforcement action in which the CFPB is not a party—the court ruled that, unlike Comerica here, the defendant failed to "explain how funding for . . . an agency is tied to its lawful ability to act." Finally, in *CFPB v. SoLo Funds, Inc.*, 2:24-cv-04108-RGK-AJR, 2024 U.S. Dist. LEXIS 189410, *5–6 (C.D. Cal. Oct. 17, 2024), the court similarly provided no explanation for rejecting the funding challenge, stating only that it was "not persuaded . . . that the [CFPB's] source of funding—even if illegitimate—is grounds for dismissal."

asks the Court to grant it unprecedented authority to police customer service call wait times as a potential UDAAP. Such an expansive view of the CFPB's UDAAP authority must be supported by "clear congressional authorization." *West Virginia v. EPA*, 597 U.S. at 723. The CFPB has not pointed to such authorization, and the statute precludes such an expansive interpretation. The Court should therefore dismiss Count I.

Congress did not delegate to the CFPB unfettered discretion to declare any practice a UDAAP and thereby impose potentially crippling penalties for engaging in that putatively illegal practice. Just over a year ago, another court in this Circuit struck down a similar attempt by the CFPB to expand the scope of the UDAAP prohibition and its authority. *See Chamber of Comm. of the U.S. v. CFPB*, 691 F. Supp. 3d 730, 743 (E.D. Tex. 2023) (rejecting the CFPB's attempt to declare discriminatory conduct a UDAAP). The CFPB's asserted authority to police customer service call wait times finds no support in the applicable statute.

The CFPA grants the CFPB the authority to take action "to prevent a covered person or service provider from committing or engaging in [a UDAAP] under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a). The statute defines "unfairness" to mean an act or practice that causes or is likely to cause consumers substantial injury that they cannot reasonably avoid and is not outweighed by countervailing benefits to consumers or competition. *Id.* § 5531(c). The UDAAP prohibition does not reference the type of customer service issues—such as call wait times—that the CFPB proclaims "unfair" in its Amended Complaint. *See generally* 12 U.S.C. § 5531. Comerica is aware of no case in which a federal court has endorsed the application of the CFPA's UDAAP prohibition to reach customer service call wait times that are allegedly too long as a permissible exercise of the Bureau's statutory authority. In fact, courts have rejected, as a matter of law, attempts to allege inadequate customer service as an

unfair practice under state corollaries. *See, e.g., Haymore v. Amazon.com, Inc.*, No. 2:24-cv-729 TLN-SCR, 2024 U.S. Dist. LEXIS 210177, at *19 (E.D. Cal. Nov. 19, 2024) ("Failing to provide adequate customer service is, as a matter of law, not an unfair business practice").

Given the CFPA's silence, this Court should not be the first to interpret the statute as authorizing the CFPB's expansive claim of authority over customer service issues. The consequences would be drastic for the industry. Financial services companies would be compelled to invest significant resources into compliance programs in an effort to comply with the CFPB's unilateral expectations. *See Chamber of Commerce*, 691 F. Supp. 3d at 740 (emphasizing "the millions of dollars per year spent by companies attempting to comply" with the CFPB's UDAAP rule at issue in the case).[7] In fact, since the availability of customer phone support affects nearly every consumer, one would expect the CFPA to provide a "clear congressional authorization" for the CFPB's oversight authority over such a ubiquitous feature of everyday life. *West Virginia*, 597 U.S. at 723. The Court should reject the CFPB's unsupported claim of authority and dismiss Count I.

### III.    Count II Should Be Dismissed Because the CFPB's Assertion of Its UDAAP Authority Is Inconsistent with EFTA

Count II of the Amended Complaint alleges that Comerica engaged in unfair acts or practices in violation of the CFPA in connection with the Bank's (or its vendor's) handling of enrollment fraud. AC ¶¶ 104-110. Congress enacted EFTA to address fraud involving electronic fund transfers. The CFPB cannot interpret the UDAAP prohibition to circumvent the will of

---

[7] That is particularly so when the financial services company is administering a federal program and its actions are already overseen by another federal agency (here, the BFS) with authority to require specific corrective actions. *Supra* at 4 (describing the BFS's oversight and control of Comerica). The CFPB's attempt to impose through litigation more onerous requirements than those demanded by the BFS would essentially "put the federal courts into the regular business of deciding intrabranch and intraagency policy disputes—a role that would be most inappropriate." *Director, Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 129 (1995).

Congress. The Court should reject the CFPB's attempt to do so and dismiss Count II.

When enacting EFTA in 1978, Congress noted that ". . . due to the unique characteristics of [electronic systems to transfer funds], the application of existing consumer protection legislation is unclear, leaving the rights and liabilities of consumers, financial institutions, and intermediaries in electronic fund transfers undefined." 15 U.S.C. § 1693(a). The purpose of EFTA is to provide a "basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." *Id.* § 1693(b).

It is well established that the obligations of a specific statute generally control over a more general statute, and "[t]hat is particularly true where . . . 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'" *RadLAX Gateway Hotel, LLC*, 566 U.S. at 645. This canon also operates to avoid "the superfluity of a specific provision that is swallowed by a general one . . . ." *Id.* The CFPB asks the Court to authorize the swallowing of EFTA by the CFPA's UDAAP prohibition.

The framework established by EFTA covers the activity the CFPB attempts to shoehorn under its UDAAP authority through Count II. Specifically, the statute and the regulation reflect the rights and responsibilities of consumers and financial institutions in connection with fraud, account enrollment, and the transfer of government benefits.[8] EFTA also includes, in addition to sections related to civil and criminal liability, an administrative enforcement mechanism that empowers the CFPB to enforce the requirements of the law. *See* 15 U.S.C. § 1693o(a)(5). The CFPB ignores this framework, instead claiming that conduct related to enrollment fraud should be governed by the CFPA's general UDAAP prohibition. 12 U.S.C. § 5531(a). This would render EFTA largely

---

[8] *See, e.g.*, unauthorized transfers (*e.g.*, fraud) provisions (15 U.S.C. §§ 1693f, 1693g; 12 C.F.R. §§ 1005.6 and 1005.11), provisions containing requirements for account enrollment (15 U.S.C. § 1693c), and provisions related to the transfer of government benefits (12 C.F.R. § 1005.15).

superfluous, and cannot be what Congress intended.

Additionally, as noted above, when enacting EFTA, Congress indicated that existing consumer protection legislation were insufficient for the unique characteristics of electronic fund transfer systems. 15 U.S.C. § 1693(a).  There has been a federal ban on unfair and deceptive acts or practices since 1938. *See Wheeler-Lea Act*, ch. 49, § 3, 52 Stat. 111 (1938) (current version at 15 U.S.C. § 45(a)). In other words, the "existing consumer protection legislation" that Congress deemed insufficient for the purposes of governing electronic fund transfer systems included the same type of ban on unfair acts or practices that the CFPB seeks to apply in Count II.

The Court should not permit the CFPB to substitute the judgment of Congress for its own. Given that EFTA comprehensively regulates the electronic fund and remittance transfer systems, Congress could not have intended to superimpose the CFPB's UDAAP enforcement provisions over this regulatory framework. The Court should dismiss Count II.

## IV.    Counts I and II Retroactively Apply New Statutory Interpretation to Past Conduct in Violation of Due Process

Even if the CFPA's UDAAP prohibition could be interpreted to cover the conduct at issue in Counts I and II, such interpretations would not be grounded in precedent and would represent a sudden departure from the historic understanding of the statute. The application of such novel interpretations violates Comerica's Fifth Amendment due process rights.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox TV Stations, Inc*., 567 U.S. 239, 253 (2012). "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment" and "requires the invalidation of laws that are impermissibly vague." *Id*. Due process therefore requires agencies to "provide regulated parties fair warning of the conduct [a regulation] prohibits or requires." *Christopher*, 567 U.S. at 156 (internal quotation marks and citation omitted) (alteration in original).  An "agency

should not change an interpretation in an adjudicative proceeding where doing so would impose new liability on individuals for past actions which were taken in good-faith reliance on agency pronouncements." *Id.* at 156-57 (internal quotation marks, alterations, and citation omitted). An agency's retroactive application of a new statutory or regulatory interpretation to a party's conduct without fair notice violates that party's due process rights. *See, e.g.*, *PHH Corp. v. CFPB*, 839 F.3d 1, 46 (D.C. Cir. 2016) (vacating an order following an enforcement action where the Department of Housing and Urban Development sought retroactively to prohibit conduct it had previously permitted), *reinstated in relevant part on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018), *abrogated on other grounds*, *Seila L. LLC v. CFPB*, 591 U.S. 197 (2020).

The CFPB failed to provide requisite fair notice to Comerica prior to initiating its investigation that it would interpret the CFPA's UDAAP prohibition to permit its policing of customer service call wait times and enrollment fraud. The CFPB cannot point to any timely and relevant public actions that would have put Comerica on notice that it considered long customer service call wait times to be within the scope of the UDAAP prohibition. In fact, in its own engagements with consumers, the CFPB seems to find long customer service wait times to be acceptable. *See* CFPB, *CreditRepair.com and Lexington Law refund checks: What you need to know* (Dec. 5, 2024), available at https://www.consumerfinance.gov/about-us/blog/creditrepaircom-and-lexington-law-refund-checks-what-you-need-to-know/ (FAQs including request for consumers to "[p]lease be patient and keep in mind that customer service wait times may be long due to the large number of check recipients"). The only potentially relevant actions occurred well after the beginning of the time period at issue in the Amended Complaint (*i.e.*, April 2019) and none was tested in court.[9]

---

[9] *See, e.g.*, Consent Order, *In the Matter of Bank of America, N.A.*, File No. 2022-CFPB-0004, ¶¶ 59-75 (July 14, 2022); CFPB, Policy Statement on Abusive Acts or Practices (April 3, 2023), *available at*

With respect to enrollment fraud, Comerica is not aware of any instance in which the CFPB has pursued publicly a UDAAP claim for the type of conduct alleged in Count II. While the CFPB has applied the UDAAP prohibition to conduct related to unauthorized enrollment in services or opening of accounts, that is materially different than the subject of the CFPB's allegation in this case. *See, e.g.*, Consent Order, *In the Matter of Wells Fargo Bank, N.A.*, 2016-CFPB-0015, ¶¶ 16-37 (finding the unauthorized enrollment in online bank services and the unauthorized opening of credit card accounts, ordering of debit cards, and enrollment in online-banking services by the financial institution to be unfair and/or abusive).

In sum, the CFPB provided little or no notice of the novel interpretations of the CFPB's UDAAP prohibition that underpin Counts I and II. Where the CFPB did take action that could be considered notice, the action was not timely. As a result, Counts I and II violate Comerica's Fifth Amendment due process rights and should be dismissed.

V.      **The Amended Complaint Fails To Allege Plausibly Any Violation of the CFPA, EFTA, or Regulation E**

Each of the Counts in the Amended Complaint alleges a violation of the CFPA, EFTA, or Regulation E but, in every instance, fails to supply sufficient facts to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The Court, therefore, should dismiss all Counts.

---

https://www.consumerfinance.gov/compliance/supervisory-guidance/policy-statement-on-abusiveness/ (policy statement that cited "time spent trying to obtain customer support assistance" as a consumer interest for the purposes of the definition of an "abusive act or practice" under the CFPA). The CFPB filed a complaint in 2015 citing the inability to reach customer service representatives as one of numerous facts in support of an allegation of an abusive practice. *See* Complaint, *CFPB v. PayPal, Inc.*, No. 1:15-cv-01426-RDB, ECF No. 1, ¶ 70-75 (May 19, 2015). But the *PayPal* complaint would not constitute adequate notice to Comerica given the other factors involved in the allegation—*e.g.*, the providing of misinformation to consumers by customer service representatives. *Id.* In addition, the inability to reach customer service representatives was not part of the stipulated order that resolved the case. *See,* Stipulated Final Judgment and Order, *CFPB v. Paypal, Inc.*, No. 1:15-cv-01426-RDB, ECF. 7, (May 19, 2015). The CFPB also issued a consent order finding that failure to properly prepare for a failed system conversion that, among other things, strained customer service capabilities amount to an unfair act or practice. *See* Consent Order, *In the Matter of UniRush LLC and Mastercard International Incorporated*, File No. 2017-CFPB-0010, ¶¶ 28-36 (Feb. 1, 2017). This action also does not provide fair warning given the unique circumstance of the customer service failures—*e.g.*, the inadvertent deactivation or failure to properly transfer thousands of cards accounts.

A. <u>The CFPB Fails To Allege Plausibly that Customer Service Call Wait Times Experienced by Some Direct Express Cardholders Were Unfair (Count I)</u>

An act or practice is "unfair" under the CFPA only if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and . . . such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1). The CFPB's allegations with respect to customer service call wait times do not meet those criteria. Out of the millions of consumers that receive benefits to a Direct Express prepaid card, the CFPB supplies two instances to support its conclusory allegations that consumers were substantially injured by long call wait times. AC ¶¶ 57-58.  But the Amended Complaint contains no factual allegations supporting key elements of its claim—that call wait times comprised substantial consumer injury that was not outweighed by countervailing benefits. *See CFPB v. Intercept Corp.*, No. 3:16-cv-144, 2017 U.S. Dist. LEXIS 143789, at *11 ("Although the complaint contains several allegations that Intercept engaged in or assisted in unfair acts or practices, it never pleads facts sufficient to support the legal conclusion that consumers were injured or likely to be injured. Nothing in the complaint allows the defendants or the court to ascertain whether any potential injury was or was not counterbalanced by benefits to the consumers at issue.").

Additionally, contrary to the CFPB's assertions that calls disconnected via Heavy Queue harmed consumers, the opposite is true: the tool provided a substantial *benefit* to consumers by ensuring higher priority requests for customer service during times of heavy call volume remained in the queue for a more expeditious response. Cardholders receive the Heavy Queue message only after indicating, via automated options, that the purpose of the call is of a lower-priority type, such as a balance inquiry, relative to other purposes. This practice has substantially benefitted consumers by ensuring that higher priority requests receive faster access to customer service

representatives. Moreover, those consumers with lower-priority needs are directed to the website where they can also obtain assistance.

In short, the facts alleged in the Amended Complaint do not meet the elements for finding an "unfair" act or practice. Count I must be dismissed.

B. <u>The CFPB Fails To Allege Plausibly that Comerica's Handling of Alleged Enrollment Fraud Was Unfair (Count II)</u>

Count II alleges that Comerica unfairly provided consumers with inaccurate and incomplete information after confirming instances of enrollment fraud. AC ¶ 104-110. The Amended Complaint asserts that, after finding that enrollment fraud occurred, one of Comerica's vendors sent a letter noting that "the transaction(s) in question were not unauthorized; therefore, no error occurred" and provide information on how to remedy the issue if the consumer called customer service. *Id.* ¶¶ 62, 4. Even if taken as true, these facts do not support a plausible unfairness claim because the alleged injury was reasonably avoidable.

"An injury is reasonably avoidable if consumers have reason to anticipate the impending harm and the means to avoid it, or *if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact.*" *FTC v. RCG Advances, LLC*, 695 F. Supp. 3d 368, 387 (S.D.N.Y. 2023) (citing *Davis v. HSBC Bank Nev., N.A.*, 691 F. 3d 1152, 1168-69 (9th Cir. 2012)) (internal quotation marks omitted) (emphasis added). Here, the allegedly impacted consumers could reasonably avoid the injury asserted by the CFPB.

Cardholders who contacted the vendor in this context were clearly aware that an account had been opened in their name—otherwise they would not have contacted the vendor. It is also reasonable to expect that the consumers would know the source of the government benefit they should be receiving (*i.e.*, the relevant agency). The CFPB suggests that the vendor should have "inform[ed] consumers that they should contact the government entity paying the benefits at issue to recover any benefits that may have been stolen." AC ¶ 63. The average consumer would be

aware of, and reasonably capable of pursuing, that potential avenue for mitigating any potential injury. The fact that consumers could reasonably avoid the injury alleged by the CFPB means that the conduct cannot be "unfair." Therefore, Count II should be dismissed.

    C.   <u>The CFPB Fails To Allege Plausibly that Comerica's Assessment of ATM Withdrawal Fees Was Unfair (Count III)</u>

Count III alleges that Comerica unfairly assessed consumers ATM fees in violation of the CFPA. AC ¶¶ 111-117. This allegation is flawed because consumers could reasonably avoid the ATM fees. An act or practice is not "unfair" if the associated harm is "reasonably avoidable." 12 U.S.C. § 5531(c)(1). In this instance, the consumers could reasonably avoid the ATM fee by not attempting to withdraw money when their account did not contain sufficient funds. As the CFPB admits, consumers can use the Direct Express website or phone application to check their account balance. AC ¶ 38. Given the ease with which consumers could obtain balance information, they could easily avoid the fees associated with a failed transaction. Therefore, the facts alleged by the CFPB do not satisfy the criteria of an unfair act or practice under the CFPA, and Count III should be dismissed.

    D.   <u>The CFPB Fails To Allege Plausibly that Comerica Required Cardholders to Waive a Right Conferred by EFTA (Count IV)</u>

Count IV alleges that Comerica violated the anti-waiver provision of EFTA, 15 U.S.C. § 1693l, because a past version of the Direct Express Terms of Use ("TOU") contained a requirement purportedly constituting a waiver of the right to stop a preauthorized transfer. AC ¶¶ 118-122. The CFPB's allegation is not supported by Regulation E or its own official commentary or precedent.

EFTA states that "[n]o writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by [EFTA]." 15 U.S.C. § 1693l. Under EFTA, "[a] consumer may stop payment of

a preauthorized electronic fund transfer by notifying the financial institution orally or in writing at any time up to three business days preceding the scheduled date of such transfer." *Id.* § 1693e(a). The Amended Complaint alleges that the inclusion of language in an old version of the TOU instructing consumers to notify the merchant in connection with a request to stop a preauthorized payment constituted a waiver of the right to stop preauthorized payments in violation of EFTA anti-waiver provision. AC ¶¶ 121-122. Neither the language cited by the CFPB nor the surrounding sentences support the conclusion that consumers waived any rights under EFTA or Regulation E.

A consumer's right to stop a preauthorized payment is reflected in Regulation E. 12 C.F.R. § 1005.10(c). The CFPB's official interpretation of that provision states: "The institution may confirm that the consumer has informed the payee-originator of the revocation (for example, by requiring a copy of the consumer's revocation as written confirmation to be provided within 14 days of an oral notification)." 12 C.F.R. Part 1005, Supp. I, cmt. 10(c)-2. If, under the CFPB's official interpretation, a financial institution may "require[e] a copy of the consumer's revocation" as "confirmation that the consumer has informed the payee-origination" (*e.g.*, merchant) of the stop payment, it logically follows that the financial institution may require the consumer to inform the merchant of the stop payment. Any other reading would render the official commentary nonsensical. Far from being a waiver, the sentence cited by the CFPB is simply a reflection of the regulation and the CFPB's own guidance.

The language surrounding the requirement cited by the Bureau further supports the conclusion that it is not a waiver. The consumer's right to stop a preauthorized payment is clearly stated in the preceding sentences. *See* Declaration of Jennifer of Gehr in Support of Motion To Dismiss, Ex. A-1 (TOU).[10] The remainder of the language surrounding the requirement is drawn

---

[10] The Amended Complaint extensively references the TOU, and Count IV is based on disclosures in the TOU. When ruling on Comerica's motion to dismiss, the Court may, therefore, properly consider the document as incorporated by

from the text of 15 U.S.C. § 1693e(a) or informs the consumer that Comerica may try to implement the requested stop payment even if the request does not comply with statutory timing requirements—none of which suggests the consumer has waived any right.

The language in the TOU also falls well short of the type of provision the CFPB has historically pursued as a "waiver" in violation of the EFTA. For example, in its Summer 2020 Supervisory Highlights, the CFPB cited as illegal waivers provisions in stop payment requests forms and deposit agreements that required consumers to agree to indemnify and hold harmless the financial institution in connection with honoring or failing to successfully implement stop payment requests. *See*, CFPB, *Supervisory Highlights*, Issue 22, Summer 2020, p. 8 (September 2020). More recently, the CFPB filed a lawsuit containing an allegation that a company violated the EFTA anti-waiver provision by including in terms and conditions a statement that "accountholders are not entitled to the protections of EFTA and other federal consumer financial laws." Complaint, *CFPB v. Walmart Inv.*, No. 24-cv-4610, 2024 CFPB Admin. Proc. LEXIS 94, *51 (D. Minn. Dec. 23, 2024).

The language cited by the CFPB cannot be a waiver because it is simply a restatement of the CFPB's official interpretation of Regulation E. Count IV should be dismissed.

E.    The CFPB Fails To Allege Plausibly that Comerica Failed To Honor Stop Payment Requests of Preauthorized Transfers (Count V)

Count V alleges that Comerica violated Regulation E by failing to honor timely submitted stop-payment requests. AC ¶¶ 123-127. In support of this claim, the Amended Complaint alleges that prior to July 2, 2020, Vendor 1 failed to process stop payment requests unless the consumer indicated they had already contacted the merchant. *Id.* ¶ 81. The Amended Complaint also states

---

reference in the Amended Complaint.  *See, e.g., Money v. City of San Marcos*, No. 24-50187, 2025 WL 429980, at *4 (5th Cir. Feb. 7, 2025) ("When determining whether a plaintiff's claims satisfy Rule 12(b)(6), our review includes documents that the complaint incorporates by reference.").

that prior to August 31, 2020, Vendor 2 processed stop payment requests by closing the Direct Express prepaid card account and issuing a new account number and card because the Vendor lacked the capability to implement stop preauthorized payment requests. *Id.* ¶¶ 82-83. Even if these facts are taken as true, they do not support a plausible allegation of a Regulation E violation.

As stated above, requiring a consumer to contact a merchant in connection with a request to stop a preauthorized payment is consistent with the CFPB's official commentary. *See* 12 C.F.R. Part 1005, Supp. I, cmt. 10(c)-2. Therefore, even if Vendor 1 required the consumer to indicate they had contacted the merchant, it would not constitute a violation of Regulation E.

The alleged conduct of Vendor 2, as described in the Amended Complaint, also falls short of a Regulation E violation as it is consistent with CFPB's official commentary, which states:

> If an institution does not have the capability to block a preauthorized debit from being posted to the consumer's account - as in the case of a preauthorized debit made through a debit card network or other system, for example - the institution may instead comply with the stop-payment requirements by using a third party to block the transfer(s), as long as the consumer's account is not debited for the payment. 12 C.F.R. Part 1005, Supp. I, cmt. 10(c)-3.

This commentary indicates that an institution that lacks the ability to implement stop payment requests may comply with the requirement so long as the consumer's account is not debited. The CFPB does not allege consumers' accounts were debited for the relevant payments under Vendor 2's alleged approach. Because the alleged conduct underlying the CFPB's Count V is permissible under the CFPB's own official commentary, the claim should be dismissed.

F.  The Remaining Regulation E Claims Are Supported by Nothing More than Recitations of the Regulation and Naked Assertions (Counts VI, VII, and VIII)

Counts VI, VII, and VIII each allege violations of specific Regulation E provisions. AC ¶¶ 132, 137, 141. With respect to each of those Counts, the Amended Complaint does not provide any factual support for the CFPB's claim, but rather recites the relevant Regulation E requirement and states that Comerica failed to comply. *See, e.g.*, AC ¶¶ 86-90, 129-132 (in support of Claim VI, a

restatement of the Regulation E requirements regarding a timely investigation of a notice of error and a statement that Comerica failed to comply). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. A complaint must contain "enough factual matter (taken as true)" to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. As a result, Counts VI-VIII must be dismissed.

## VI.    The CFPB's Claims Are Untimely, at Least in Part

"A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *Smith v. BP Expl. & Prod.*, No. 23-30552, 2024 U.S. App. LEXIS 9528, *4 (5th Cir. 2024) (citation and quotation marks omitted). Each of the CFPB's claims is barred in whole or in part.

### A.    Counts I, II, and III Are Untimely in Part Under the CFPA's Three-Year Statute of Limitations

Under the CFPA, "no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1). "The date of discovery is the date when the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *CFPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL 7188792, at *19 (S.D.N.Y. Dec. 2, 2016) (internal quotation marks and citation omitted). With respect to discovery, a plaintiff must "plead sufficient facts to put the defense on notice of the theories on which the complaint is based." *Colonial Penn. Ins. Co. v. Market Planners Ins. Agency, Inc.*, 1 F.3d 374, 376 (5th Cir. 1003) (internal quotation marks and citation omitted) (discussing pleading requirements applicable to the "discovery rule" in federal court). "A complaint may be subject to dismissal if its allegations affirmatively demonstrate that the plaintiff's claims are barred by the statute of limitations and fail to raise some basis for tolling." *Frame v. City of Arlington,* 657 F.3d 215, 240 (5th Cir. 2011).

23

The Amended Complaint alleges violations of the CFPA based on conduct that occurred more than three years prior to the commencement of this enforcement action via the filing of the initial Complaint. *See, e.g.*, AC ¶ 106. Even accounting for the time period subject to the parties' tolling agreements,[11] claims based on such conduct would be time-barred unless the CFPB can raise a basis for tolling—*i.e.*, that it discovered the conduct more recently. The Amended Complaint does not "plead sufficient facts to put the defense on notice" of any basis for tolling. *Colonial Penn. Ins. Co.*, 1 F.3d at 376. As a result, taking into account the time period subject to the parties' tolling agreements, any CFPB claim is untimely as to alleged conduct occurring prior to October 2020. Therefore, Counts I, II, and III should be dismissed in part.

B.  Counts IV-VIII Are Untimely in Whole or in Part Under EFTA's One-Year Statute of Limitations

An EFTA or Regulation E claim (Counts IV through VIII) must be filed "within one year from the date of the occurrence." 15 U.S.C. § 1693m(g). Therefore, any of the CFPB's EFTA or Regulation E claims related to conduct prior to December 6, 2023—*i.e.*, one year prior to the filing of the CFPB's initial Complaint—are untimely.

The CFPA's statute of limitations does not apply because the claims contained in Counts IV through VIII arise solely under EFTA. The CFPA's statute of limitations includes the caveat that "[a]n action arising under this title does not include claims arising solely under enumerated consumer laws" and "[i]n any action arising solely under an enumerated consumer law, the Bureau may commence, defend, or intervene in the action in accordance with the requirements of that provision of law, as applicable." 12 U.S.C. § 5564(g)(2)(A)-(B). In other words, if a CFPB action arises solely under an enumerated law, the statute of limitations of that law applies. EFTA is an

---

[11] The CFPB and Comerica agreed to toll the statute of limitations for any CFPA or EFTA claim related to the CFPB's investigation for a total of one year, one month, and 15 days.

"enumerated consumer law" and Counts IV through VIII arise solely thereunder. Consequently, EFTA's statute of limitations applies. *Id.* § 5481(12)(C).

Other enumerated consumer laws include provisions that explicitly state that a violation of the respective law is a violation of the CFPA. *See, e.g.*, 15 U.S.C. § 1607(b). Courts have relied on those provisions to find that the CFPA's statute of limitations applied to CFPB actions based on violations of those enumerated consumer laws.[12] In contrast, EFTA *does not* state that a violation of EFTA is a violation of the CFPA. *Id.* § 1693o(b). Therefore, EFTA's statute of limitations must apply.[13] This means that Counts IV and V are untimely and should be dismissed in their entirely while Counts VI, VII, and VIII are at least partially barred.

Alternatively, even if the Court determines that the CFPA's statute of limitations applies to the CFPB's EFTA and Regulation E claims, Counts IV through VIII are wholly or partially barred. As stated above, under the CFPA, taking into account the time period subject to the parties' tolling agreements, any CFPB claim is untimely as to alleged conduct occurring prior to October 2020.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint with prejudice.

---

[12] *See, e.g., CFPB v. Snap Fin. LLC*, No. 2:23-cv-00462-JNP-JCB, 2024 U.S. Dist. LEXIS 136828, at *35-36 (D. Utah Aug. 1, 2024) (citing 15 U.S.C. § 1681s(d) in holding that CFPA statute of limitations applied to CFPB action for violations of the Fair Credit Reporting Act); *BCFP v. Fifth Third Bank, N.A.*, No. 1:21-cv-262, 2023 U.S. Dist. LEXIS 202055, at *19-20 (S.D. Ohio Sep. 26, 2023) (same); *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 46-49 (D. R.I. 2020) (citing 15 U.S.C. § 1607(b) in holding that CFPA statute of limitations applied to CFPB action for violations of Truth in Lending Act ("TILA")); *CFPB v. Ocwen Fin. Corp.*, No. 17-80495-civ, 2019 U.S. Dist. LEXIS 152336, at *69 (S.D. Fla. Sept. 5, 2019) (citing 15 U.S.C. § 1692l(b)(6) in holding that CFPA statute of limitations applied to CFPB actions for violations of the Fair Debt Collection Practices Act).

[13] The CFPB may argue that the statute of limitations contained in EFTA only applies to private actions and not those of the CFPB. This argument has already been rejected by at least one court examining an analogous provision in the TILA. *See CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 922 (S.D. Ind. 2015) (finding that 15 U.S.C. § 1640 applies to a CFPB action arising under the CFPA) *but see Citizens Bank, N.A.*, 504 F. Supp. 3d at 48-49 (finding "much of the ITT court's reasoning . . . unconvincing").

DATED this 17th day of March, 2025.    Respectfully submitted,

MATTHEW P. PREVIN
(admitted *pro hac vice*)
  matthewprevin@paulhastings.com
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: (202) 318-6049

JONICE M. GRAY
(admitted *pro hac vice*)
  jonicegray@paulhastings.com
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1781

  ***/s/ Paul R. Genender***
PAUL R. GENENDER
(Texas Bar No. 00790758)
  paulgenender@paulhastings.com
PAUL HASTINGS LLP
2001 Ross Avenue, Suite 2700
Dallas, Texas 75201

Telephone: (972) 936-7500

*Counsel for Defendant Comerica Bank*

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was electronically filed with the Clerk of Court via the CM/ECF system, and was electronically served on all known counsel of record on this the 17th day of March 2025.

  ***/s/ Paul R. Genender***
Paul R. Genender